THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID ESTRADA, Defendant-Appellant.

First District (5th Division)   No. 1—91—1529

Opinion filed February 11, 1993.

Daniel T. Coyne and Geary W. Kull, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Barbara L. Jones, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

In a bench trial, defendant David Estrada (Estrada) was found guilty of first-degree murder on a theory of accountability and was sentenced to 20 years' imprisonment. He appeals his con-

viction principally on the following theories: (1) that the trial court misconstrued the law of accountability, (2) that Estrada was not found guilty beyond a reasonable doubt, and (3) that the trial court improperly considered the statement of a codefendant whose trial had been severed from Estrada's trial. We note that Estrada has been free on bond pending this appeal.

The facts are as follows.

In February 1991 codefendants Gerardo Degollado (Degollado), Juan Portillo (Portillo) and Estrada came before the trial court on charges of murder in the first degree in conjunction with the shooting death of Jesus Sanchez on the evening of November 17, 1989. Each of the defendants waived his right to a jury trial and was tried by the judge in simultaneous but severed trials.

At trial Mario Martinez Alvarado (Martinez), who spoke only Spanish, testified through an interpreter. According to his testimony, on November 17, 1989, he lived in the vicinity of Karlov and 24th Place in the City of Chicago. At about 7 p.m. he met "Flacko," a friend whom he had known for about three months. They planned to go to a party that was to be held near 25th and Trumbull. "Flacko" was identified in court as Degollado.

Sometime later that evening, as Martinez and Degollado were on the street near 26th and Trumbull, they saw "Dagger," whom Martinez had met only once before. Dagger was driving a blue Buick, four-door car. Martinez and Degollado got into the car and began to ride around the neighborhood. Dagger was identified in court as Portillo.

Portillo drove the car, Degollado sat in the front passenger-side seat and Martinez sat in the back, behind the driver. After about 1½ to 2 hours of driving around, they met "Tiny," who was identified as Estrada. Estrada spoke with Portillo and then got into Portillo's vehicle and began to ride around with them. At some point a black vehicle pulled up alongside the Buick and the occupants of that car had a conversation with Estrada.

According to Martinez, as they rode around the area Portillo pulled out a gun. Martinez did not see where the gun had been or how Portillo had obtained the gun. Portillo aimed the gun at a person who was standing near a bus stop on 26th Street, but did not fire the gun at this time.

Martinez further testified that about five minutes later, Portillo pulled up in front of a building at Karlov and 24th Place, where a Hispanic male was standing. Portillo and Estrada began to shout at the person "something about gangs." Portillo then

reached across Degollado, aimed the gun out the passenger-side window, and fired the gun twice. The Hispanic male bent over and ran. Estrada exited the car carrying a tire iron and proceeded to smash a window of the house where the Hispanic person had been standing. Estrada then got back into the car and they drove away.

Martinez stated that after the incident he and Degollado both asked to be taken home immediately. Portillo then drove him to his home.

Chicago police officer Frank Castro testified that a short time later, around midnight on the evening of November 17, 1989, he arrived at a residence located in the 4100 block of West 24th Place in Chicago in response to a radio broadcast indicating that a man had been shot. When he arrived at the scene paramedics were already present and removing Jesus Sanchez, the victim of gunshot wounds, from the premises. Castro secured the front of the residence where the shooting allegedly occurred and spoke with several witnesses at the scene. About 20 minutes later he left the area to go to the hospital.

Another Chicago police officer, J. Veraveic, testified that at about 2:15 a.m. on November 18, 1989, he was in the area of 2200 South Ridgeway when he was flagged down by a man. Based upon a conversation with this man, Veraveic called for backup and then took off after a person who could be seen running from the area. Chicago police officer Ramos appeared on the scene in response to the call. Veraveic caught the man who was running and arrested him. This man was later identified as Estrada.

Officer Ramos testified that he received a radio broadcast indicating that there was an aggravated assault with a gun in progress at 2200 South Ridgeway. He immediately arrived at the scene and spoke with a man, Ronald Jenkins, identified as the complainant. He saw Officer Veraveic apprehend Estrada and he (Ramos) recovered a .22 semi-automatic pistol approximately 75 feet from where Estrada was arrested. Ramos made an in-court identification of the gun that was recovered and testified that the gun had not contained any bullets when it was recovered.

The next evidence adduced at trial concerned statements given by the defendants. Portillo and Degollado had each given signed written statements to the police which were admitted into evidence. However, these statements were only to be considered in

regard to their own cases since the trials were severed.[1] Detective Robert Browne of the Chicago police testified regarding the oral statements made by Estrada. Browne stated that he had interviewed Estrada at about 4:30 p.m. on November 18, 1989, while in the presence of Detective Vucko. At that time Estrada gave a statement in which he indicated that on the evening of November 17, 1989, he had been driving around with his cousin "Kado," Danny Cantu and Manuel Banda. He saw Jesus Perez and Thomas Tinius[2] in Perez's car. Perez had been in an accident and his bumper was entangled with another vehicle. Estrada took a jack out of Perez's car and freed Perez's bumper.

Portillo also pulled up to the scene in his car and Estrada got into the back passenger seat of Portillo's car. Cantu and Banda got into Perez's car. Degollado and a Spanish-speaking male (Martinez) were already in Portillo's car. Estrada stated that he knew that Degollado had a .22 semi-automatic gun.

As Estrada drove around in Portillo's car, he saw Perez again. Perez pulled his car up next to Portillo's car and they had a conversation. Both cars then drove to 24th and Karlov, where they saw two Hispanic males standing. Degollado reached out the window and "represented," *i.e.*, made gang symbols for the Latin Kings. The two individuals on the street represented as Two-Sixers. Estrada then began to exit Portillo's car with the tire iron. As he exited the car he heard two shots. Estrada chased after one of the individuals, who ran up the stairs and into the vestibule. Estrada gave up the chase and broke a first-floor window of the building where the one individual entered. Estrada got back in Portillo's car and they drove off.

Detective Browne further testified that when questioning Estrada on the following day, in the presence of Assistant State's Attorney Ryan, Estrada admitted that the gun that had been recovered at the time of his arrest was one he had taken from Portillo's car and the same one that had been used in the shooting at 24th and Karlov. However, Estrada stated that he had been unaware that anyone had

---

[1]Although reference is made to these statements being placed into the trial record, they were not read into the record during trial and the record on appeal does not contain copies of these written statements. Therefore, this court is unaware of the exact information that these statements contain.

[2]The proper spelling of this person's name was never established. There appear to be several spellings used including "Tinknius," "Tiknius" and "Tinius." For the sake of consistency, this court will use the "Tinius" spelling in reference to this individual, regardless of the various spellings that may be used in the transcript.

actually been shot on the evening of November 17. Estrada also indicated that the gun had been hidden in Portillo's car inside the glovebox, behind the clock, and that Degollado had passed the gun to Portillo.

It was stipulated that Fournier, a crime lab technician, had run ballistics tests on the gun recovered from Estrada. He would testify that the tests, although not conclusive, indicated that the markings from the gun compared favorably with the markings on the bullet that was recovered from the victim, Jesus Sanchez.

Next it was stipulated that Dr. Kalelkar, a forensic pathologist, if called would testify that an autopsy was performed on Jesus Sanchez, a 16-year-old male. The autopsy revealed that Sanchez had died of a single gunshot wound to the upper abdomen which perforated the diaphragm, the right lower liver, the abdominal aorta and the left renal vein.

At the close of the State's evidence, each of the defendants moved for a directed verdict. The court granted the motion only as to Degollado. The court found that even if Degollado had passed the gun to Portillo, this had taken place several minutes before·they reached the corner of 24th and Karlov. Degollado's only overt act at the time of the shooting was "signing" or "representing" with gang symbols. Thus the court found no nexus between Degollado's action of passing the gun and the shooting.

The trial court denied the motions for directed verdict as to Portillo and Estrada. After his motion for directed verdict was denied, Portillo rested without presenting any further evidence. The trial court then found Portillo guilty of murder in the first degree. Estrada, however, proceeded to present further evidence.

Defendant Estrada first presented evidence by way of stipulation. It was stipulated that Fournier, the crime lab technician, if called would testify that the .22 semi-automatic gun that was recovered at the time of Estrada's arrest was a "Jennings J" weapon and that between 10,000 and 100,000 of these weapons were "on the street." Next it was stipulated that Chicago police officer Galegos, if called, would testify that he spoke with Martinez in ·Spanish and that Martinez had indicated that the shots were fired as Estrada was getting out of Portillo's vehicle.

The defense then presented Marion Zamudio (Zamudio) as a witness. Zamudio testified that he had been with Sanchez on the corner of 24th and Karlov on the night of November 17, 1989. Around midnight a four-door Buick drove up and a black car stopped behind the Buick. The front-seat passenger in the Buick said, "Almighty Latin

Kings." Sanchez responded, saying "Fuck you and Two Six." Zamudio later explained that Sanchez was a member of the Two-Sixers gang and that the Two-Sixers were rivals with the Latin Kings and the UPP or Underground Party People, which were affiliated gangs.

After Sanchez responded as a Two-Sixer, two shots came from the front of the Buick. Zamudio stated that he asked Sanchez if he was okay and Sanchez said that he was. They both ducked and ran. Zamudio ran north on Karlov and Sanchez ran west on 24th. Zamudio stated that while he ran he looked back and saw someone pointing something at him. Also, as he ran he heard glass breaking and another shot. Later, in a police lineup, Zamudio identified Tinius as the man who had pointed something at him after the shooting in front of 24th and Karlov.

Detective Browne was recalled to testify. He admitted that Tinius had been taken into custody in regard to the Sanchez shooting, that Tinius had been in a black Lincoln on the night of the shooting and that a gunshot residue test had been performed on Tinius.

Lab technician Berk was then called to testify regarding the residue test. These tests, however, were inconclusive and did not establish that Tinius had fired a gun.

The defense rested and the State then called Detective Browne once again for rebuttal. Detective Browne was questioned regarding his interview with Zamudio. Browne testified that Zamudio told him that when the Buick pulled up to the corner the passenger in the Buick had represented down towards the Two-Sixers and that Zamudio had responded in kind. The rear-seat passenger (Estrada) then told them to "go get fucked" and began to exit the vehicle. Zamudio and Sanchez then took a step backwards. Just then two shots were fired.

After Detective Browne testified, the State rested. The trial court heard argument and then, in a lengthy narrative, found that "defendant must be guilty by accountability for the shooting of Mr. Sanchez." However, at the close of the court's statements, the trial judge stated, "I think all of these facts impel but one conclusion. And that's the defendant on the theory of accountability is guilty of attempt murder."

The case was passed but shortly thereafter the case was recalled. The prosecutor then informed the court that it appeared that a reference had been made to attempted murder. The trial court responded with the following dialogue:

> "THE COURT: Flow. And also found guilty on first degree murder on accountability. If I said attempt murder, I misspoke.

MR. ZELAZO [Prosecutor]: I don't know which it was and just so it's reflected in the record.

MR. COYNE [Defense Attorney]: You clearly said it. You clearly said it.

THE COURT: Bring him back out. He is not charged with attempt murder. How could I mean that. So let's bring him back out.

THE COURT: Okay. Mr. Estrada, there is [sic] been some confusion. And I might have misspoken even. During the course of my remarks, it appears that your counsel and maybe the state's attorney, and I know my clerk thought I said I had found you guilty by accountability of attempt murder. If I said that it was in error.

You are not charged with attempt murder. You're charged only with first degree murder. And the actual correct statement that I intended and thought I had made was that I found you guilty by accountability of first degree murder. And that will be the finding of this Court, just so there is nothing unclear. And Mr. Estrada seems to understand that also. Thank You."

Nevertheless, on March 13, 1991, defendant brought a motion in arrest of judgment, contending that the court's finding that defendant was guilty of attempted murder, although a misstatement by the court, was a final judgment rendered in open court which could not be changed. Furthermore, defense counsel argued that this judgment operated to acquit Estrada of the greater offense of murder and, because the finding was legally inconsistent, jeopardy attached and the verdict actually operated to discharge the defendant of all charges.

The trial court denied the motion for arrest of judgment and the motion for new trial that was tendered immediately thereafter. Estrada was later sentenced to the minimum term of 20 years' imprisonment. He now brings this timely appeal.

On appeal, Estrada contends (1) that the trial court improperly applied a "concerted action" test in finding him accountable for first degree murder, (2) that there was insufficient evidence for the trial court to have found him guilty of first degree murder, (3) that the trial court improperly relied upon evidence taken from a codefendant's statement which should not have been considered because the trials were severed, (4) that, even if properly considered, the codefendant's statement established that the act of shooting was done recklessly, establishing the mental state for involuntary manslaughter, (5) that because the trial court found Estrada guilty of attempted

murder and signed a mittimus to that effect on February 8, 1991, and because the court failed to vacate that order, the trial court was powerless to substitute a finding of murder for the finding of attempted murder on March 13, 1991, at the sentencing hearing wherein defendant moved to arrest judgment, and (6) that Estrada's conviction is inconsistent with Degollado's acquittal[3] and, therefore, must be reversed.

Despite the numerous issues raised by Estrada, we believe that the dispositive question is whether Estrada, under the facts of this case, may be held legally accountable for murder or whether the trial court improperly applied a "concerted action" theory. Because we find no evidence of a common design or plan, we reverse Estrada's conviction.

■ Illinois criminal law states that a person is accountable for the crime of another if:

> "Either before or during the commission of an offense and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1989, ch. 38, par. 5—2.)

In this case the trial court found Estrada accountable for the crime on a theory of a common design. The statute does not mention the term "common design," but certain case law does. For example, in *People v. Coleman* (1991), 222 Ill. App. 3d 614, 584 N.E.2d 330, the court discussed the association between "common design" and criminal accountability. The *Coleman* court found that a defendant could be shown to possess the criminal intent of a principal, and thus be held accountable, through proof that they shared a community of purpose or "common design." The court went on to hold that common design need not be expressly stated, but rather, may be deduced from the circumstances surrounding the incident, which might include defendant's presence at the commission of the crime without disapproving or opposing it.

■ The Illinois Supreme Court has also followed the "common plan or purpose" concept in determining accountability. However, this has only been done where the evidence discloses, at least by infer-

---

[3]We recall here that codefendant Degollado was granted a directed verdict at the close of the State's case and that codefendant Portillo, who was the shooter according to the evidence presented at trial, was convicted of murder. Portillo's appeal (No. 1—91—1526), although filed prior to Estrada's appeal, still pends before another division of this court.

ence, that in addition to being present at the scene of the crime, the accountable party had some advance knowledge of the criminal plan or scheme. (*People v. Furby* (1990), 138 Ill. 2d 434, 563 N.E.2d 421.) Otherwise, it is well established that mere presence at the scene of a crime is not sufficient to sustain a conviction on an accountability theory. See *People v. Furby*, 138 Ill. 2d 434, 563 N.E.2d 421; *People v. Ceasar* (1992), 231 Ill. App. 3d 54, 596 N.E.2d 89 (even though defendant and codefendant both ran after the commission of a theft, defendant's mere presence at the scene of the theft was insufficient to hold defendant responsible for the theft on a theory of accountability. One justice dissented, apparently because defendant fled with the culprit).

In the present case there is no direct evidence tying Estrada to a common plan or design to shoot Sanchez. The evidence shows that Estrada, who left the car brandishing a tire iron, had already exited the car when Portillo fired a gun at Sanchez. Although Estrada's acts indicate that he intended to intimidate Sanchez, there is no evidence that he was aware that Portillo intended to shoot at Sanchez. In fact, it is less likely that Estrada would leave the car to pursue Sanchez if he knew that Portillo intended to fire at Sanchez. Furthermore, any inference that Estrada was part of a common design or plan is negated by the fact that Degollado, who was also present in Portillo's car prior to the shooting, was found not to be accountable by the trial judge.

For these reasons, we believe that we are required to follow the case law which states that mere presence at the commission of an offense without any affirmative act of assisting, abetting or encouraging the act is not sufficient to make a party accountable for the commission of an offense. (*People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520.) In accordance with this case law, we must reverse Estrada's conviction and sentence. The evidence fails to provide, beyond a reasonable doubt, any basis to hold Estrada accountable for Sanchez's death.

Reversed.

GORDON, P.J., and COUSINS, J., concur.