# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Flynn, 2012 IL App (1st) 103687**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DESTEPHANO FLYNN, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-3687 |
| Filed<br>Rehearing denied | December 21, 2012<br>January 22, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions for first degree murder and attempted first degree murder involving the discharge of a firearm during each crime, the appellate court rejected defendant's contentions that he was not proved to be accountable for the attempted murder and that the 20-year firearm enhancement to his sentences did not apply to him because he was not a principal in the offenses, since the attempted murder fell within the scope of the intention of defendant's companions to kill the murder victim and the sentencing enhancement applied to principal offenders as well as accountable codefendants. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-18935; the Hon. Neera Lall Walsh, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal

Michael J. Pelletier, Alan D. Goldberg, and Adrienne N. River, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Mary Beth Kinnerk, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court, with opinion.

Justice Reyes concurred in the judgment and opinion.

Justice Gordon concurred in part and dissented in part, with opinion.

## OPINION

¶ 1      After a jury trial, defendant Destephano Flynn was convicted of first degree murder and attempted first degree murder and for personally discharging a firearm during each crime. He was sentenced to 66 years in prison.

¶ 2      On appeal, he contends that: (1) the State failed to prove that he was accountable for attempted murder because he did not assist the codefendant in shooting the attempted murder victim and the State did not prove that the shooting of the attempted murder victim was an act in furtherance of the planned killing of the murder victim; and (2) the trial court erred by adding the 20-year firearm enhancement to defendant's sentences because the State did not prove that defendant was a principal in the murder and attempted murder offenses.

¶ 3      For the reasons that follow, we affirm defendant's convictions and sentences. We conclude that (1) the State proved beyond a reasonable doubt that defendant was guilty of attempted first degree murder on a theory of accountability; and (2) the trial court properly added the 20-year firearm enhancements to defendant's sentences for murder and attempted murder based on his personal discharge of a firearm.

¶ 4                                    I. BACKGROUND

¶ 5      On August 4, 2001, there was a shooting during a dice game in Tilton Park at Lake Street and Kostner Avenue in Chicago. The park was in an area that the Dog Pound street gang claimed as its territory. Jermaine Collins, a drug dealer and member of the Unknown Vice Lords street gang, was shot several times and died. Billy Taylor was also shot as he fled the scene, but he survived the attack.

¶ 6      The State arrested and charged defendant in 2007 with the first degree murder of Collins, the attempted first degree murder of Taylor, aggravated battery with a firearm, and aggravated discharge of a firearm. The State alleged that Collins was shot eight times by Dog

Pound members defendant, Deon Coleman, Robert Holly and a fourth, unknown male. The State also alleged that Taylor was shot a few times by codefendant Darius Epting and Gregory Matthew, who were also Dog Pound members.

¶ 7 Simultaneous jury trials were held for defendant and codefendant Epting in October 2010. At defendant's trial, the evidence established that, at 4:29 a.m. on August 4, 2001, the police responded to a call of a person shot in Tilton Park. Collins's dead body was facedown in a grassy area of the park. The police were notified that a second shooting victim had driven himself to the hospital. Cartridge cases, fired bullets and bullet fragments recovered at the scene indicated that multiple weapons were used with multiple calibers of ammunition made by different manufacturers. Collins had three $5 bills clutched in his right hand and one $50 bill and eleven $20 bills in his left hand. A .380-caliber cartridge case, stamped with the manufacturer's mark "RP," was recovered next to his body.

¶ 8 A blood trail on the sidewalk went north across Lake Street and down the sidewalk for about 60 feet. Along the blood trail, the police found several .25-caliber cartridge cases with the manufacturer's mark "CCI." Several copper-colored bullet fragments were located on the sidewalk and across the street from the park. Retired Chicago police officer and forensic investigator Arthur Oswald testified that the blood trail showed someone was bleeding and moving in close proximity to the crime scene. Investigator Oswald found a brass-colored cartridge near the curb. On the sidewalk in the blood trail, he found a larger aluminum cartridge case. Four fired .25-caliber cartridge cases, which were brass and had the manufacturer's mark "WW," were found on the street near Kostner Avenue across from the park. Two aluminum .25-caliber cartridge cases with the manufacturer's mark "CCI" were found on the north side of Lake Street across from the park. Another "CCI" automatic .25-caliber cartridge case was collected from the curb gutter at 4356 West Lake Street. A fired bullet was recovered on the north side of Lake Street across from where Collins's body was found. Copper-colored bullet fragments were recovered at 4356 and 4350 West Lake Street. The police also found a clear plastic bag that contained smaller plastic bags of suspected cannabis 46 feet southeast of Collins's body.

¶ 9 The autopsy revealed that Collins had eight gunshot wounds: five in his head, one in his neck, one in his back, and one in his leg. The stippling around the gunshot wound behind his left ear indicated that the weapon was within 18 to 24 inches of his body when it was fired. Bullets and bullet fragments were recovered from Collins's brain, neck, cheek and chest. A firearms examiner examined the bullets and fragments recovered from Collins's body. One bullet was a .390/.38 caliber. Three bullets were .22 caliber, but the examiner could not testify about whether those three bullets were fired from the same firearm or whether they were fired from a revolver or semiautomatic. He also could not determine the caliber of the fifth bullet or the two metal fragments.

¶ 10 Billy Taylor testified that, at the time of the shooting, he was playing a dice game at the park. When he initially spoke to the police after the shooting, he did not admit that he knew the shooters because he was afraid for the safety of his family, who lived in the neighborhood. Taylor did, however, tell the police that defendant and Henry Clark were at the dice game. In 2003, two years after the shooting and during an unrelated investigation, a confidential informant, during a taped consensual overhear, spoke with Taylor, who

admitted that he knew more about the shooting than he had told the police. That information, however, was not given to Detective John Madden of the cold case unit of the Chicago police department until October 2006. After the Collins's murder investigation was reopened, an investigative alert was issued for Taylor, who was finally located on April 6, 2007, when he was stopped for a traffic violation. By this time, Taylor and his family had moved to the suburbs, so Taylor cooperated with the police. Taylor identified codefendant Epting as the person who shot him in the back. Taylor also identified defendant and Deon Coleman as the people who shot at Collins.

¶ 11 Taylor testified that he was not a street gang member, but he played dice with Collins because Taylor loved to gamble and play high stakes games for thousands of dollars. When Taylor had played dice with Collins a few days before the August 4 shooting, they were playing for $1,500 or $2,000, and codefendant Epting tried to grab Taylor's money off the ground. Collins, however, told Epting "no," that was not his money, and to "watch out." Epting walked away but he said something about the money being his. Taylor also saw defendant at that earlier dice game.

¶ 12 Taylor testified that he learned about the August 4 dice game from Henry Clark and arrived at the game around 9 or 10 p.m. Defendant, codefendant Epting, Clark, Collins, and some of Collins's friends were also present. After five or six hours, the game started to wind down. Only Taylor and Collins were still playing; the others had drifted off to the side as they lost money. Then Deon Coleman, a person Taylor had never seen before, came from behind a parked car, pointed a gun at Collins's head, and started shooting at Collins and chasing him. Initially, Taylor just froze and saw defendant come from behind the car and chase Collins. Taylor then ran in the opposite direction, north on Kostner Avenue toward Lake Street. As codefendant Epting chased Taylor, Taylor heard gunshots and was shot in his back. Epting was only three or four feet behind Taylor at that time. Initially, Taylor thought the attack was a robbery, so he dropped his money and his Rolex watch as he ran. Epting, however, kept chasing Taylor and the shooting continued, so Taylor realized this was more than a robbery. Taylor ran east on Lake Street, and Epting continued to chase him. Taylor turned around and tried to fight Epting. Epting pointed his gun at Taylor's head, so Taylor put both his hands up in front of his face. Epting fired the gun, and the bullet went through the palm of Taylor's right hand. When Taylor did not hear anymore gunshots, it seemed that Epting's gun either jammed or was out of bullets because Epting ran away. Taylor ran to his car on Kostner Avenue and drove to the hospital. The bullet in his back was too close to his spine to be removed, so there was no evidence presented at trial about the caliber of that bullet.

¶ 13 When Henry Clark was interviewed in prison by Detective Madden and Assistant State's Attorney Donald Lyman, he was serving a seven-year sentence for aggravated battery with a firearm. He also had several more felony convictions for domestic battery and criminal damage to property. He agreed to testify and was not promised anything in return for his cooperation. He stated that he was a member of the Dog Pound street gang along with defendant, codefendant Epting, Robert Holly, Deon Coleman, and Gregory Matthews. Although Clark got along with Collins, the other members of the Dog Pound had problems with Collins because he was making money selling drugs in Tilton Park. Furthermore,

defendant had conflicts with Collins that stemmed back to when they were both incarcerated together.

¶ 14     Clark testified that at the time of the shooting, he had been playing dice with defendant, codefendant Epting, Collins, and Taylor. Some people in the game were getting mad because they were losing money and people started leaving. When defendant lost all his money, he and Epting left the game. Clark said defendant was a sore loser. Epting was also mad, but he did not lose as much money as defendant. About five minutes after defendant and Epting left, Clark heard his nephew whistle from a block away as a warning. Then Robert Holly and defendant ran up shooting at Collins. Epting fired a gunshot toward Taylor and chased him toward Lake Street. There was another shooter out there, but he wore a hooded sweatshirt and Clark could not see his face. Clark ran to his car and started to drive off, but he was flagged down by Epting. Clark gave Epting a ride and saw that he had blood on his shirt and was acting nervous. Clark dropped Epting off at North and Lockwood Avenues.

¶ 15     Clark testified that he spoke with defense investigator Mary Clements in 2010. He did not want to talk to her about Dog Pound business so he initialed changes she made to his grand jury testimony just to get rid of her. He did not pay attention to what she wrote on the transcript or crossed out. Clark stated that his grand jury testimony was truthful and denied telling Clements that defendant was not one of the shooters.

¶ 16     Mary Clements testified about her meeting with Clark. She corrected his grand jury statement to reflect what he told her, *i.e.*, that after defendant and codefendant Epting lost their money at the dice game, they left. According to Clements, Clark stated that when the shooting started, he saw only Robert Holly's gun and started running so that he would not get shot; Clark did not see defendant or codefendant Epting.

¶ 17     Detective Madden questioned defendant after his arrest on August 10, 2007. Defendant's videotaped statement was published to the jury. According to that statement, defendant left the park and eventually went home and slept. Codefendant Epting and Robert Holly came to defendant's house after leaving the dice game and woke defendant up. They told defendant that they wanted guns because Collins "got to go," which defendant understood to mean that Collins had to die. Defendant kept guns hidden in a hollowed out teddy bear. He put a .22-caliber revolver in his pocket and gave codefendant Epting a .38- or .357-caliber gun. Holly had a .357-, .44- or .45-caliber revolver. Epting and Holly left defendant's house, and defendant took his time putting on his shoes before following them back to the park because he hoped the shooting would be over by the time he got there. When he arrived at the park, he saw Holly shoot Collins. Defendant admitted firing his gun once or twice in Collins's direction but claimed that he was not trying to hit Collins and did not know whether he actually hit Collins. Defendant also admitted that he saw codefendant Epting and Gregory Matthews shoot at Taylor. Furthermore, defendant saw Holly go to Collins and shoot him at close range in the head.

¶ 18     The jury found defendant guilty of first degree murder and attempted first degree murder and for personally discharging a firearm during each crime. Codefendant Epting was acquitted by his jury. Defendant was sentenced to a total of 66 years in prison, which consisted of the consecutive sentences of 20 years for the murder plus 20 years for personally

discharging a firearm during that murder, and 6 years for the Class X offense of attempted murder plus 20 years for personally discharging a firearm during that attempted murder.

¶ 19                                II. ANALYSIS
¶ 20                       A. Attempted First Degree Murder
¶ 21     Defendant contends the State failed to prove beyond a reasonable doubt that he was guilty of the attempted murder of Taylor under general accountability principles or the common-design rule because the shooting of Taylor was not an act in furtherance of the planned killing of Collins and defendant did not assist codefendant Epting in shooting Taylor.

¶ 22     When the sufficiency of the evidence is challenged, a criminal conviction will not be set aside unless the evidence, when viewed in the light most favorable to the prosecution, is so improbable or unsatisfactory that a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. *People v. Gilliam*, 172 Ill. 2d 484, 515 (1996). The reviewing court may not retry the defendant. *People v. Rivera*, 166 Ill. 2d 279, 287 (1995). The trier of fact determines the credibility of the witnesses, the weight given to their testimony, and the reasonable inferences drawn from the evidence. *People v. Enis*, 163 Ill. 2d 367, 393 (1994).

¶ 23     The law is clear that a person may be held accountable for the conduct of another in certain limited circumstances. A person is legally accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate [such] commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2010). "Where one attaches himself to a group bent on illegal acts which are dangerous or homicidal in character, or which will probably or necessarily require the use of force and violence that could result in the taking of life unlawfully, he becomes accountable for any wrongdoings committed by other members of the group in furtherance of the common purpose, or as a natural or probable consequence thereof even though he did not actively participate in the overt act itself." *People v. Morgan*, 39 Ill. App. 3d 588, 597 (1976). See *People v. Kessler*, 57 Ill. 2d 493, 496-97 (1974) (where the defendant had jointly planned a burglary, he was accountable for the conduct of others in the attempted murder of the store owner and a policeman).

> "Mere presence of a defendant at the scene of a crime does not render one accountable for the offense. [Citations.] Moreover, presence at the scene plus knowledge that a crime was being committed, without more, is also insufficient to establish accountability. [Citation.] Nevertheless, active participation has never been a requirement for the imposition of criminal guilt under an accountability theory. [Citation.] One may aid and abet without actively participating in the overt act. [Citation.]
>
> A defendant may be deemed accountable for acts performed by another if defendant shared the criminal intent of the principal, or if there was a common criminal plan or purpose. [Citations.] Words of agreement are not necessary to establish a common purpose to commit a crime. The common design can be inferred from the circumstances

surrounding the perpetration of the unlawful conduct. [Citations.] Proof that defendant was present during the perpetration of the offense, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability. [Citation.] Defendant's flight from the scene may also be considered in determining whether defendant is accountable. [Citation.] Evidence that defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another. [Citation.]" *People v. Taylor*, 164 Ill. 2d 131, 140-41 (1995).

¶ 24    After reviewing the evidence in the light most favorable to the State, we find that there was sufficient evidence for a rational trier of fact to find defendant guilty of the attempted first degree murder of Taylor under an accountability theory. The State's evidence showed that defendant knew Epting and Coleman wanted to return to the dice game where Collins was playing with Taylor and kill Collins. Furthermore, in response to Epting and Coleman's stated plan, defendant armed himself with the gun he later fired at Collins and gave codefendant Epting the gun Epting later used to shoot Taylor. In addition, defendant went back to the park and joined the shooters, who surprised Collins and Taylor while they were playing dice and opened fire on them. Defendant was an active participant in the orchestrated shooting that resulted in the death of Collins and the severe wounding of Taylor. While defendant, Coleman and Holly pursued Collins and fired their guns at him, Epting and Matthews pursued and fired gunshots at Taylor, an outsider to the Dog Pound and potential witness against them. Defendant did not withdraw from the group or demonstrate any opposition to the group's planned actions. At no time did he attempt to warn the police or the victims or otherwise attempt to prevent the execution of the group's plan.

¶ 25    Under all those circumstances, it was reasonable for the trier of fact to conclude that defendant subscribed to an unlawful venture that used violence and firearms and, as a natural consequence, resulted in the death of Collins and the severe wounding of Taylor. He was, therefore, in addition to being guilty of the murder of Collins, also guilty of the attempted murder of Taylor on a theory of accountability. Contrary to defendant's assertion on appeal, it is inconsequential whether he or any of the other shooters specifically discussed shooting Taylor in addition to shooting Collins. Defendant and the other shooters clearly planned and intended to surprise Collins and Taylor while the two victims were together playing dice and open fire on them.

¶ 26    To support his argument that the State failed to prove him accountable for the attempted murder of Taylor, defendant cites *People v. Lincoln*, 157 Ill. App. 3d 700 (1987), but we find that case distinguishable. In *Lincoln*, the defendant and three codefendants, Watson, Elston and Johnson, had discussed going to Donald Mitchell's apartment to " 'take care of him.' " *Id*. at 703. Once the group arrived at the apartment, the defendant and Watson confronted Mitchell and a woman in a bedroom while Elston and Johnson remained in the living room with the decedent, Tony Carter. *Id.* at 702. After the defendant told Watson to shoot Mitchell in the head, defendant and Watson were pushed out of the bedroom and Watson fired two shots at Mitchell and the woman through the bedroom door. *Id.* Then the defendant and

Watson pushed through the bedroom door, struggled with Mitchell over the gun, and fled the scene down the backstairs. *Id.* Meanwhile, Elston killed Carter in the living room with a shotgun. *Id.* at 702-03. The court remanded the cause for a new trial on other grounds, and found that the defendant could not be retried for Carter's murder because that killing was not part of the defendant's alleged plan " 'to get' " Mitchell and the defendant was not present during the events that led to Carter's killing. *Id.* at 706.

¶ 27    Assuming, *arguendo*, that *Lincoln* was correctly decided concerning the accountability issue, it is distinguishable from the case before us because defendant was present during the events that led to Taylor's shooting. Although the Dog Pound's stated plan may have been to get rid of Collins, defendant knew that Taylor had been playing dice with Collins at the park when he gave Epting the gun Epting used to shoot Taylor. Moreover, defendant and Epting were angry about losing money in the dice games to Collins and Taylor, two outsiders to the Dog Pound street gang. When the Dog Pound arrived at the park and took their positions behind parked cars, they clearly saw that Taylor was still with Collins playing dice. Defendant then actively participated in the Dog Pound's surprise attack on Collins and Taylor. While defendant, Coleman and Holly pursued Collins and fired gunshots at him, Epting and Matthews pursued and shot at Taylor.

¶ 28    Defendant also cites *People v. Estrada*, 243 Ill. App. 3d 177 (1993), where the court held the State failed to prove the defendant was guilty of first degree murder on a theory of accountability. The evidence showed that the defendant and his companions were riding in a car and exchanged opposing gang signs with some men on the street. *Id.* at 180. As defendant exited the car with a tire iron, one of his companions fired a gun at the deceased. Defendant chased the deceased into a building and broke a window with the tire iron. *Id.* The court ruled that although the defendant's acts indicated that he intended to intimidate the victim, there was no evidence that the defendant was aware that his companion intended to shoot at the victim. *Id.* at 185. The court also reasoned that it was unlikely that the defendant would have left the car had he known that shots were about to be fired. *Id. Estrada* is distinguishable from the instant case because, here, defendant had advance knowledge of the plan to get rid of Collins and facilitated that plan by supplying guns, actively participating, and firing his own gun when the Dog Pound surprised Collins and Taylor at the park and opened fire on them.

¶ 29    "Proof of the common purpose or design need not be supported by words of agreement, but may be drawn from the circumstances surrounding the commission of the unlawful conduct." *People v. Jones*, 376 Ill. App. 3d 372, 383-84 (2007). Given the nature of the Dog Pound's orchestrated attack on Collins and Taylor at the park, defendant cannot credibly claim that the shooting of Taylor in addition to Collins was unexpected or unanticipated. The record does not support defendant's attempt on appeal to separate the planned attack that occurred at the park into two separate and unrelated crimes. Viewing the evidence in the light most favorable to the prosecution, we find that the testimony of Taylor and Clark and defendant's own videotaped statement were sufficient to support the conclusion of the trier of fact that defendant voluntarily attached himself to a group bent on illegal activities so as to support an inference of common design to sustain his conviction for the first degree attempted murder of Taylor.

¶ 30    Finally, the dissent would construe the accountability statute to mean that when a defendant and his companions have agreed to engage in a criminal act, and a companion–during the commission of the agreed-upon criminal act–commits another criminal act in furtherance of the agreed-upon criminal act, the defendant cannot be held accountable for his companion's additional criminal act unless the defendant had agreed to that additional action. The dissent's construction of the accountability statute, however, overlooks our supreme court's interpretation of that statute. Specifically, our supreme court has held that the accountability statute has been interpreted as meaning that " 'where one aids another in the planning or commission of an offense, he is legally accountable for the *conduct* of the person he aids; and that the word *"conduct" encompasses any criminal act* done in furtherance of the planned and intended act.' " (Emphases added.) *People v. Sangster*, 91 Ill. 2d 260, 265 (1982) (quoting *Kessler*, 57 Ill. 2d at 497). The evidence presented to the jury included testimony that about five minutes after defendant and Epting left the dice game, they returned with other members of the Dog Pound, and–with guns in their hands–ran at Collins and Taylor, who were still together playing dice. While defendant, Coleman and Holly pursued Collins and fired gunshots at him, Epting and Matthews pursued and shot at Taylor. Adhering to the standard of review, we find that the evidence supports the jury's determination that defendant was accountable for his companions' conduct, which included the shooting of Taylor.

¶ 31                           B. Firearm Sentencing Enhancements

¶ 32    Defendant contends the trial court erred by adding the 20-year firearm sentencing enhancement, based on his personal discharge of a firearm, to both his murder and attempted murder convictions. Defendant argues that his enhanced sentences are void because the statutes establishing the firearm sentencing enhancements are ambiguous concerning whether the enhancement applies only to the principal offenders who actually inflicted a gunshot wound on the victim or also applies to accountable codefendants.

¶ 33    Section 5-8-1(a)(1)(d) of the Unified Code of Corrections provides for three firearm sentencing enhancements for first degree murder:

> "(d)(i) if the person committed the offense while armed with a firearm, 15 years shall be added to the term of imprisonment imposed by the court;
>
>     (ii) if, during the commission of the offense, the person personally discharged a firearm, 20 years shall be added to the term of imprisonment imposed by the court;
>
>     (iii) if, during the commission of the offense, the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court." 730 ILCS 5/5-8-1(a)(1)(d) (West 2010).

¶ 34    In construing a statute, a court must give effect to the legislative intent, and the inquiry into the legislative intent begins with the statute's language, which must be given its plain and ordinary meaning. *People v. Pullen*, 192 Ill. 2d 36, 42 (2000). We conclude that the plain language of the first degree murder sentencing statute establishes that the 20-year

-9-

enhancement applies to the accountable defendant who personally discharged a firearm during a first degree murder.

¶ 35        Unlike subsections (d)(ii) and (iii), subsection (d)(i) does not contain any language that limits its application to persons who personally discharge a firearm. Consequently, an unarmed defendant who is convicted, under a theory of accountability, of committing the offense of first degree murder while armed with a firearm is subject to subsection (d)(i)'s 15-year sentence enhancement. See *People v. Rodriguez*, 229 Ill. 2d 285, 295 (2008) (the court was required by statute to impose the 15-year firearm enhancement to the sentence of the unarmed accountable defendant who stood by while his coconspirator shot the murder victim). Although subsection (d)(ii) limits the applicability of accountability principles somewhat by requiring the first degree murder accountable defendant to have personally discharged a firearm, (d)(ii)–unlike subsection (d)(iii)–does not contain any language that restricts its application to only those defendants who personally discharged a firearm that actually caused the victim's severe injury or death. In subsection (d)(ii), the limiting word "personally" modifies only the clause "discharged a firearm," and, thus, does not insulate from its application the accountable defendant, like Destephano Flynn, who personally discharged a firearm during the murder offense but may not have fired the actual gunshot that hit the murder victim.

¶ 36        Defendant, however, cites to *dictum* in *Rodriguez* and argues that our supreme court has held that the use of the term "personally" in subsection (d)(ii) makes the principles of accountability and common design inapplicable. Specifically, the court wrote:

"In subsections [(d)](ii) and (iii), however, the limiting word 'personally' is used. We hold that the term 'personally,' like 'actually' as used in section 9-1(b)(6)(a)(i) [of the Criminal Code of 1961 (720 ILCS 5/9-1(b)(6)(a)(i) (West 2006)), which restricts the death penalty to only those who 'actually killed' the victim], insulates subsections (ii) and (iii) from the application of the principles of accountability and common design. In contrast, subsection (i) contains no such limiting language and applies not only to those who are actually armed, but also to those who are accountable for the criminal actions of others who are actually armed." *Id.*

¶ 37        We find that defendant's literal application of the above-quoted text to his case misapplies the holding of *Rodriguez*. The quoted text was made in the context of the court's analysis of the application of the firearm enhancements to an *unarmed* accountable defendant. In that context, the subsection (d)(ii) and subsection (iii) enhancements would not apply because they both require the accountable defendant to have personally discharged a firearm. In the case before us, however, there is no dispute that defendant personally discharged his firearm. Accordingly, defendant's reliance on the above-quoted text is misplaced. Furthermore, the State has conceded that, because the offense involved multiple shooters and multiple weapons, the evidence was not sufficient to establish that any of the gunshots defendant fired actually hit Collins and proximately caused his death. Accordingly, defendant is not subject to subsection (d)(iii)'s 25-year sentence enhancement.

¶ 38        In addition to the plain language of the statute, the rationale of *Rodriguez* also supports our conclusion that an accountable defendant, like Destephano Flynn, who personally

discharged a firearm during the commission of the offense of first degree murder but may not have proximately caused the victim's severe injury or death, is subject to subsection (d)(ii)'s 20-year sentence enhancement. Specifically, *Rodriguez* relied on the holdings in *Sangster*, 91 Ill. 2d 260, and *People v. Jordan*, 103 Ill. 2d 192 (1984).

¶ 39    In *Sangster*, 91 Ill. 2d at 266, the court held that even though the accountable defendant did not physically participate in the crimes of murder, armed robbery and aggravated kidnapping, he was subject to the imposition of consecutive sentences based upon the sentencing statutory requirement concerning the infliction of severe bodily injury. The court concluded that the principles of accountability and common design applied to both the determination of a defendant's culpability for a criminal act and the calculation of his sentence in compliance with sentencing statutes. *Id.* at 265-66. The court reasoned that when the legislature enacted the consecutive sentencing statute, the legislature must be presumed to have known that the accountability statute had been construed to mean that the accountable defendant was legally accountable for the conduct of the person he aids, and the word "conduct" encompasses any act done in furtherance of the planned and intended act. *Id.* at 265. Further, the court concluded that if the legislature had intended for the consecutive sentencing provisions to be inapplicable to accountable defendants, it would have been a simple matter to provide for an exception in the text of the statute. *Id.* at 265-66.

¶ 40    In *Jordan*, 103 Ill. 2d at 202-03, the accountable defendant, who physically restrained a bystander while the accomplice killed the victim, was subject to an extended-term sentence based on the brutal and heinous nature of the crime. Applying the reasoning set forth in *Sangster*, the *Jordan* court held that an extended-term sentence under the relevant statute may be imposed upon a defendant found guilty on an accountability theory. *Id.* at 215.

¶ 41    Our conclusion that defendant is subject to the 20-year sentencing enhancement is consistent with the rationale of *Rodriguez*, *Sangster*, and *Jordan*, *i.e.*, that when a defendant aids or abets another in committing a crime, he is accountable and may be punished in compliance with sentencing statutes for any criminal act his codefendant did in furtherance of the crime, whether that act was being armed with a firearm, inflicting severe bodily injury, or committing a brutal and heinous felony.

¶ 42    We also reject defendant's argument that the statute is ambiguous because subsection (d)(ii)'s phrase "during the commission of the offense" precedes the language "the person" and, thus, one possible interpretation of the statute could be that "the person" means only the principal. We do not agree. The plain and unambiguous language of the statute establishes that the phrase "during the commission of the offense" simply clarifies the temporal requirement within which the defendant must have personally discharged his firearm.

¶ 43    Next, defendant, for the same reasons as argued above, contends that his 20-year sentencing enhancement for personally discharging a weapon during the attempted murder of Taylor was also void because the statute is ambiguous and the evidence showed that defendant did not fire his gun at Taylor. According to defendant, he fired his gun in the direction of Collins and, thus, his personal discharge of a firearm was an act done to assist in the murder of Collins; it was not an act done to assist in the attempted murder of Taylor.

¶ 44    The relevant provisions of section 8-4 of the Criminal Code of 1961 (Criminal Code)

provide:

> "(1) the sentence for attempt to commit first degree murder is the sentence for a Class X felony, except that
>
> \*\*\*
>
> (B) an attempt to commit first degree murder while armed with a firearm is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court;
>
> (C) an attempt to commit first degree murder during which the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court;
>
> (D) an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court[.]" 720 ILCS 5/8-4(c) (West 2010).

¶ 45 Defendant's 20-year sentencing enhancement for attempted murder was imposed pursuant to section 8-4(c)(1)(C) of the Criminal Code, which uses language similar to section 5-8-1(d)(ii) of the Unified Code of Corrections. Accordingly, we rely on our analysis of subsection (d)(ii) (see *supra* ¶¶ 35-43) for our conclusion that the unambiguous language of section 8-4(c)(1)(C) establishes that an accountable defendant, like Destephano Flynn, who personally discharged a firearm during the commission of the offense of attempted first degree murder, is subject to section 8-4(c)(1)(C)'s 20-year sentence enhancement.

¶ 46 We conclude that, because the sentence enhancement was triggered, defendant was subject to the mandatory sentence enhancement of 20 years' imprisonment for both of his murder and attempted murder convictions.

¶ 47                                  III. CONCLUSION

¶ 48 For the foregoing reasons, we affirm defendant's conviction of attempted first degree murder and the imposition of the firearm sentence enhancements for both his murder and attempted murder convictions.

¶ 49 Affirmed.

¶ 50 JUSTICE GORDON, concurring in part and dissenting in part.

¶ 51 In the case at bar, defendant was convicted of the first-degree murder of Jermaine Collins and the attempted first degree murder of Billy Taylor. Defendant's attempt conviction was based solely on a theory of accountability. At trial, the State presented evidence that it was codefendant Darius Epting who shot at Billy Taylor, and not defendant. Although defendant was convicted of being accountable for Epting's actions, Epting was acquitted by a separate jury.

¶ 52      On appeal, defendant asks us to reverse his attempt conviction. He claims that he had no common design or agreement with Epting or others to kill Taylor; and the State's evidence supports his claim. Thus, I would affirm defendant's conviction for first degree murder but reverse the attempt conviction and remand for resentencing.

¶ 53      BACKGROUND

¶ 54      In the case at bar, the State's evidence showed that a group of men were playing dice late at night in a park and that the participants gradually drifted off as they lost money, until the only two people left playing were the two victims, Collins and Taylor. Defendant had been in the game earlier but had left and went home to go to sleep. At some point, defendant was awakened by codefendant Epting, who said Collins "got to go," which defendant understood to mean that Epting wanted to kill Collins. Epting, defendant and one or two other men then returned to the dice game. All the perpetrators chased Collins, except for Epting, who went off on his own, chasing Taylor. At trial, Taylor testified that Epting was the only person chasing him. Taylor testified that Epting had felt cheated by Taylor and had indicated that he believed that some of Taylor's money was actually his. Taylor testified that he dropped money as he ran from Epting but, when Epting kept chasing him, Taylor realized that this was more than about the money.

¶ 55      Despite this evidence, the majority speculates that Epting wanted to kill Taylor in order to eliminate Taylor as "a potential witness" to Collins's murder, and thus finds that Epting's chase of Taylor was in furtherance of the common agreement to shoot Collins.[1] *Supra* ¶ 24. However, there was no testimony at trial to support this speculation. In fact, the evidence at trial indicated just the opposite. Taylor, who survived, remained silent for years and did not come forward as long as he still lived in the same neighborhood. The only evidence at trial showed that Epting was acting on his own personal vendetta toward Taylor.

¶ 56      ANALYSIS

¶ 57      I. Standard of Review

¶ 58      The law of accountability is governed by statute (720 ILCS 5/5-2 (West 2010)), and we interpret this statute as we would any other statute.

¶ 59      The rules of statutory intepretation are familiar and often repeated. Interpreting a statute is a question of law, which we review *de novo*. *People v. Carter*, 213 Ill. 2d 295, 301 (2004); *People v. Davis*, 199 Ill. 2d 130, 135 (2002). If the statute's language is plain and ambiguous, it must be read exactly as written. *Carter*, 213 Ill. 2d at 301; *Davis*, 199 Ill. 2d at 135. "It is a cardinal rule of statutory construction that we cannot rewrite a statute, and depart from its plain language, by reading into it exceptions, limitations or conditions not expressed by the legislature." *People ex rel. Birkett v. Dockery*, 235 Ill. 2d 73, 81 (2009) (citing *In re Michelle J.*, 209 Ill. 2d 428, 437 (2004)). See also *Carter*, 213 Ill. 2d at 301 (" 'The most reliable

---

[1]The majority states that I conclude that Epting's chase of Taylor was "in furtherance of the agreed-upon criminal act" to shoot Collins. *Supra* ¶ 30. Actually, I reach the opposite conclusion.

-13-

indicator of legislative intent is the language of the statute, which, if plain and unambiguous, must be read without exception, limitation or other condition.' " (quoting *Davis*, 199 Ill. 2d at 135)).

¶ 60    "Criminal or penal statutes must be strictly construed in the defendant's favor, 'and nothing should be taken by intendment or implication beyond the obvious or literal meaning of the statute.' " *Carter*, 213 Ill. 2d at 301 (quoting *Davis*, 199 Ill. 2d at 135). "Where a criminal statute is capable of two or more constructions, courts must adopt the construction that operates in favor of the accused." *Carter*, 213 Ill. 2d at 302.

¶ 61                       II. Accountability Statute

¶ 62    Adopting–as we must–the construction that operates in favor of the accused, I find that the plain and unambiguous language of the accountability statute does not provide accountability for the attempt count in the case at bar.

¶ 63    The accountability statute is divided into three sections, and it provides only three ways in which a defendant may be held accountable. 720 ILCS 5/5-2 (West 2010). The introductory lines of the statute state: "When accountability exists. A person is legally accountable for the conduct of another *when*: ***." (Emphasis added.) 720 ILCS 5/5-2 (West 2010). These introductory lines are then followed by three subsections, each labeled "(a)," "(b)," and "(c)," which denote the three different ways that a person may be held accountable. 720 ILCS 5/5-2 (West 2010). The first way, which is described in subsection (a), occurs when a person causes someone without legal incapacity to act. 720 ILCS 5/5-2(a) (West 2010). The second way, which is described in subsection (b), is when the particular statute governing an offense makes the person accountable. 720 ILCS 5/5-2(b) (West 2010).

¶ 64    The third way, which is the only subsection at issue here, provides that "[a] person is legally accountable for the conduct of another when *** (c) either before or during the commission of an offense, and with the intent to promote or facilitate *that commission*, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of *the* offense." (Emphases added.) 720 ILCS 5/5-2(c) (West 2010). See also *supra* ¶ 23 (the majority quotes subsection (c) as the applicable law). As stated before, we are governed by the plain language of the statute. *Carter*, 213 Ill. 2d at 301; *Davis*, 199 Ill. 2d at 135. The plain language of subsection (c) concerns only one offense that was intended, planned and committed. As subsection (c) provides, accountability occurs when, before or during the commission of "*an*" offense and with the intent to promote "*that*" offense, the offender aids another in the planning or commission of "*the*" offense. (Emphases added.) 720 ILCS 5/5-2(c) (West 2010). *People v. Stanciel*, 153 Ill. 2d 218, 233 (1992) ("Accountability, tied as it is to the crime charged, must comport with the requirements of that crime.").

¶ 65    After providing the three ways that accountability may occur, the accountability statute also states, in an unlettered paragraph, that:

> "When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts." 720 ILCS 5/5-2 (West 2010).

When interpreting a statute, courts must consider a statute "in its entirety." *Davis*, 199 Ill. 2d at 135. "Since all provisions of a statutory enactment are viewed as a whole, words and phrases should not be construed in isolation, but should be interpreted in light of other relevant provisions of the statute." *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 81 (citing *People v. Lieberman*, 201 Ill. 2d 300, 308 (2002)). The structure of the statute indicates that "common design" was not intended as a fourth or additional way for accountability to occur. Thus, the common design paragraph must be read in harmony with the paragraphs above it.

¶ 66    When read in harmony with subsection (c), which immediately precedes it, the common design paragraph means that, when two or more people engage in a common criminal design or agreement to commit *"an"* offense, any acts in the furtherance of the common design for *"that"* offense are considered to be the acts of all parties to the common design or agreement for "*the*" offense. (Emphases added.) 720 ILCS 5/5-2(c) (West 2010). In the case at bar, "the" offense for which there was a common design or agreement was the murder of Collins, not Epting's attempted murder of Taylor.

¶ 67                          III. Application of the Law to the Case at Bar

¶ 68    The majority affirms the jury verdict on the theory that there was a common design and agreement to murder Taylor. However, there was no evidence to support this conclusion, and thus no rational trier of fact could reach this conclusion beyond a reasonable doubt. *People v. Perez*, 189 Ill. 2d 254, 268-69 (2000) ("Without knowledge of any common criminal design to harm [the victim], defendant could not intentionally aid in the scheme's commission" and defendant could not be held accountable for the victim's murder (citing *People v. Estrada*, 243 Ill. App. 3d 177 (1993) (in the absence of any evidence that defendant was aware that his companion intended to shoot the victim or direct evidence tying defendant to a common design to shoot the victim, defendant's murder conviction on a theory of accountability was reversed))).

¶ 69    The State's evidence established that the common agreement was to shoot Collins: defendant, in his statement to the police, admitted that Collins was their target; and all the perpetrators, including defendant, chased only Collins. Taylor testified that only Epting went off on his own, chasing Taylor. At trial, Taylor testified that Epting had felt cheated by Taylor and had indicated that he believed that some of Taylor's money was actually his. Thus, the State's evidence established that Epting had his own private motive for chasing Taylor. Taylor testified that he dropped money as he ran from Epting but, when Epting kept chasing him, Taylor realized that this was more than about the money. There was simply no evidence at trial to support a finding that there was a common design or agreement to shoot Taylor.

¶ 70    For the foregoing reasons, I would affirm defendant's conviction for the murder of Collins but reverse the conviction for the attempted murder of Taylor and remand for resentencing.