# Illinois Official Reports

## Appellate Court

---

### *People v. Malcolm*, 2015 IL App (1st) 133406

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY MALCOLM, Defendant-Appellee. |
| District & No. | First District, First Division<br>Docket No. 1-13-3406 |
| Filed | August 10, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-14956; the Hon. Joseph Claps, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Law Offices of Chicago-Kent College of Law, of Chicago (Daniel T. Coyne, Matthew M. Daniels, Michael R. Johnson, and Deborah Brown Lee, of counsel), for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Peter Fischer, and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Justices Connors and Harris concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a bench trial, the circuit court of Cook County found defendant, Anthony Malcolm, guilty of first-degree murder and robbery. Subsequently, the defendant was sentenced to 22 years for first-degree murder and 8 years for robbery to be served consecutively. On appeal, the defendant argues: (1) the trial court erred in finding the defendant guilty of first-degree murder and robbery based on the accountability theory; (2) the trial court erred in considering a nontestifying codefendant's statement as substantive evidence as a basis for the finding of guilt; (3) the trial court erred in sentencing the defendant to more than the minimum sentencing standards. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                    BACKGROUND

¶ 3    On July 14, 2012, at approximately 9:20 a.m., the defendant was placed under arrest by Detective Morales and his partner, Detective Taraszkiewicz of the Chicago police department, at his residence at 5549 North Broadway, Chicago, Illinois. This was done after codefendant, Malik Jones (Jones), identified the defendant as the person holding a cellular telephone and recording the assault of the victim, Delfino Mora. The defendant was charged with three counts of first-degree murder and one count of robbery. 720 ILCS 5/9-1(a)(1), (a)(2), (a)(3), 18-1(a) (West 2012).

¶ 4    On March 25, 2013, a motion was filed to sever the defendant's trial from Jones and another codefendant, Nicolas Ayala (Ayala), which the trial court granted. On May 23, 2013, the trial court conducted defendant's bench trial.

¶ 5    Chicago police officer Collazo (Officer Collazo) testified that on July 10, 2012, he was initially assigned to investigate a man down in the alley of 6308 North Artesian. Upon arriving at the scene, he noticed a red truck and a man lying face up on the ground next to a dumpster. Officer Collazo testified that the man was breathing, but had blood and vomit coming from his mouth and he was unresponsive. Sulton Shaikh was also at the scene and had initially found the man lying on the ground. Officer Collazo called for an ambulance and then attempted to identify the victim. No identification was found on the victim.

¶ 6    After the ambulance took the man to the hospital, Officer Collazo went to the red truck that was parked on the right side of the alley and found the victim's name and address from his vehicle registration. From there, Officer Collazo went to the victim's home and notified his family of the incident. He then returned to the police station to write his reports.

¶ 7    Chicago police detective Mancuso testified that on July 10, 2012, he was assigned to investigate a man found in the alley at 6308 North Artesian. Upon arriving at the scene, he was informed that the victim was taken to St. Francis Hospital and he then canvassed the area around the alley. Specifically, he also spoke with Aron Rios (Rios). Detective Mancuso testified that he believes that Rios said that he heard people laughing and having fun in the alley. The crime scene report was introduced into evidence by the defense as Defendant's Exhibit No. 1. In the crime scene report, nothing is mentioned about Rios saying he heard people laughing. Detective Mancuso also testified as to what the scene of the incident looked like and identified photograph exhibits of the alley and the dumpster area where the victim

was found. After he canvassed the area, he went to St. Francis Hospital and found out that the victim was in critical condition and had been taken into surgery.

¶ 8    Rios testified that on July 10, 2012, between 5 a.m. and 5:30 a.m., he left his Chicago apartment at 2442 West Rosemont through the alley between Artesian and Campbell to go to work. On his way down the alley, he saw a couple of individuals at the end of the alley in front of Rosemont Street. In his testimony at trial, Rios noted that the individuals laughed and commented about someone snoring.[1] Rios also noted that there were two people with another one behind them and he did not notice anyone with a backpack.

¶ 9    Maria Mora (Maria) testified that she had been married to the victim for 41 years and had 12 children. The victim did not have a job at the time of his death, but had collected metal scrap and cans to raise money for his family. On July 10, 2012, at approximately 5 a.m., the victim left his home at 6014 North Washtenaw in Chicago to collect scrap metal. He was 62 years old and left his home with his wallet, cellular telephone, and cap in a red Ford truck.

¶ 10    At approximately 8:30 a.m., an officer arrived at Maria's door and told her that the victim had passed out and had been taken to St. Francis Hospital. Maria then went to the hospital and found him in critical condition. The victim never opened his eyes or spoke again. On July 11, 2012, at approximately 3:30 p.m., the victim died. When Maria was able to see the victim's belongings, there was no wallet or cellular telephone with them.

¶ 11    Dr. Lauren Woertz (Dr. Woertz), the medical examiner for Cook County, testified that she performed the autopsy on the victim on July 13, 2012. The autopsy report was admitted into evidence along with photos of the victim's face postmortem, his head showing the suture incision from the craniotomy, and a picture of his brain. Dr. Woertz noted there were bruises on the right eye, on the right and left side of Mora's chest, and on the left forearm. There was also a scrape on the left side of the victim's back. Dr. Woertz reviewed medical records that accompanied the body, which noted evidence of right subdural hematoma, intraventricular hemorrhage, subarachnoid hemorrhage, with contusions to the brain, multiple facial fractures and a diffused hemorrhage under the scalp. After her internal investigation, she confirmed the presence of a right subdural hematoma, an intraventricular hemorrhage of the brain, a subarachnoid hemorrhage of the brain, bruises on the brain's temporal lobes, and bruises on the tongue. Dr. Woertz determined that the cause of death of the victim was craniocerebral injuries resulting from blunt head trauma sustained from an assault. Dr. Woertz testified that her opinion was within a reasonable degree of forensic, scientific certainty as to the manner of the victim's death.

¶ 12    Emmanuel Mora (Emmanuel), the victim's 21-year-old son, testified that he received a call on July 10, 2012, around 2 p.m. to 3 p.m., from a coworker, Mirena, to let him know that she was sorry for what happened to his father. Two to three hours later, he received a second call from Mirena. Mirena told him on this call that her boyfriend viewed the Facebook page of Jones and saw a video of a man being punched. Mirena and her boyfriend recorded the Facebook video and met Emmanuel at the police station to speak with detectives. At this time, Emmanuel saw the video for the first time and identified the man in the video to be his father. The video was approximately one minute long, was admitted into evidence and played for the trial court during Emmanuel's testimony.

---

[1]According to his testimony, the first time Rios mentioned to anyone that the people were laughing and having fun was the morning of trial.

¶ 13     On July 14, 2012, a woman came to the victim's home and gave the family a wallet that she had found. Denise Shaeffer (Shaeffer) testified that she found the wallet in the alley behind the fence of her yard. She was taking the garbage to the cans in the alley of the 6200 block of North Campbell, when she found a brown wallet that was wet and dirty lying on the ground. She picked up the wallet and opened it to find the identification and address of the victim. There was no cash in the wallet. She then returned the wallet to the victim's family who notified her that the victim had passed away. The next day, Shaeffer called the police and let them know she found the victim's wallet.

¶ 14     Detective Juan Carlos Morales (Detective Morales) testified that on July 14, 2012, shortly after 2 a.m., he and his partner, Detective Taraszkiewicz were assigned to investigate the victim's death. At this time, they were looking for Jones as a subject related to the crime. At approximately 2:45 a.m., both detectives went to 8849 West 167th Street in Orland Hills, Illinois, where they located Jones and arrested him. They recovered a cellular telephone in Jones' possession. The address of 8849 West 167th Street was the home of Sanchez Guzman. Vaneece Lew (Lew) was also present at this address and agreed to accompany the detectives to the police station.

¶ 15     Detective Morales testified that upon arrival at the police station, Jones was placed in an interview room and Detective Morales had a conversation with him. After this, the detectives looked for two other suspects: Ayala and the defendant. Lew assisted with the identification and the detectives located pictures of the two suspects on the Internet.

¶ 16     At approximately 9:10 a.m. on July 14, 2012, the detectives arrested Ayala at 6306 North Tallman Avenue, in Chicago. At approximately 9:20 a.m., the detectives arrested the defendant at 5549 North Broadway, in Chicago. A video recording known as an electric recording interrogation system (ERI) was made of the defendant's interview. Three clips (2 minutes, 10 minutes, and 20 minutes) from the videotaped interrogation were introduced as evidence and played for the trial court during Detective Morales' testimony. Detective Morales made an in-court identification of the defendant at trial. Detective Morales testified that at approximately 11:15 a.m. on July 14, 2012, both he and Detective Taraszkiewicz were present in the interview room with the defendant, who was advised of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and agreed to have a conversation with the detectives. During the interrogation, the defendant informed the detectives that on July 10, 2012, between 5 a.m. and 6 a.m., the defendant and Ayala were walking towards Ayala's home at 6306 North Tallman Avenue, in Chicago. At some point, Jones joined them. As they approached the alley between Artesian Avenue and Campbell Avenue, Jones turned on the video recording function of his cellular telephone.

¶ 17     The video recording made from Jones' cellular telephone was played at trial during Emmanuel's testimony. The video recording showed Jones handing the cellular telephone to Ayala, while saying "somebody hold my phone" and stating he was going to "knock this motherfucker out." Ayala then said he was going to "hit him next." The defendant then asked if Ayala was recording the incident and then said "just give it to me," referring to Jones' cellular telephone. Jones then approached the victim who was standing near the dumpster in the alley, and asked the victim if he had any money in his pocket. Ayala and the defendant followed Jones while the defendant recorded the incident on Jones' cellular telephone. Jones stood just to the left of the victim while Ayala was right in front of the victim with the defendant just to the right of Ayala. After Jones asked the victim if he had any money, the

- 4 -

victim answered in Spanish. Jones asked Ayala if he knew what the victim was saying and Ayala answered that he did not know. Jones then yelled, "Nation!," and punched the victim in the head and then yelled, "Bitch!" The victim fell to the ground and hit his head on the pavement. The video recording then ended with Jones laughing and running to the end of the alley followed by the defendant and Ayala.

¶ 18 According to the videotaped interrogation, the defendant told Detective Morales that Jones then returned to the victim and took his wallet. Jones gave $20 to Ayala. The defendant did not return to the alley with Jones and did not take any of the proceeds from the wallet. Detective Morales also testified that the cellular telephone found on Jones when he was arrested was the cellular telephone of the victim.

¶ 19 During Detective Morales' testimony, defense counsel objected to admitting into evidence portions of the defendant's videotaped interrogation as substantive evidence because during the interrogation of the defendant, Detective Morales mentioned statements that Jones had told the police earlier. The trial court then noted that this is a bench trial and that it can identify what is or is not hearsay and will only apply what is not hearsay to its ruling.

> "THE COURT: All right. Well, in the scope of this type of evidence one this is a bench trial. I know what's admissible and what's not.
>
> And in the course of an interrogation which part of this is, there is going to be and has been statements by both police officers that are based on hearsay.
>
> MR. COYNE [defense attorney]: Correct.
>
> THE COURT: That are presented to the defendant for a response. Their questions don't prevent–their questions in most cases are inadmissible hearsay. But they give reference to the answers he gives. And only those answers that apply to what he heard and saw the defendant is admissible. I know the difference."

¶ 20 The defense counsel's objection during Detective Morales' testimony was specifically about when the detective had asked the defendant during the interrogation if this was part of some sort of game and that the defendant had initially informed Detective Morales that it was just a random occasion. Detective Morales proceeded to ask the defendant what that game was called and the defendant responded that he did not understand. Detective Morales admitted at trial that this line of questioning during the defendant's interrogation occurred after he spoke to Jones and Jones had informed Detective Morales about some kind of game. Detective Morales testified he knew the name of the game, but that he wanted the defendant to say it during the interrogation. The defendant did eventually inform the detective during the interrogation that the game was called "Point Him Out, Knock Him Out." Detective Morales testified that when he asked the defendant specifically if that is what was going on during the victim's assault, the defendant's response was "no, no, no" and that this was just a random occasion. Eventually, the defendant told Detective Morales that Jones was "probably, I don't know, he probably [was]," playing the game at the time of the victim's assault. When Detective Morales asked what was going through his mind, the defendant responded, "It was shocking. I have never seen anything like that in my life."

¶ 21 The State rested their case and the bench trial continued on June 18, 2013. The defendant elected not to testify. The defense filed written stipulations regarding the testimony of Detective Morales and the State's exhibits 2 (photograph of the victim at time of death), 3

(photograph of the alley where the victim was found), and 11 (videotaped interrogation of the defendant). The court and the State accepted these stipulations. The defendant verified that he was 19 years old, a senior in high school, with a C average. The defense rested their case.

¶ 22 On July 1, 2013, the trial court found the defendant guilty of first-degree murder and robbery under a theory of accountability.

¶ 23 On July 26, 2013, the defendant filed a motion for a new trial or acquittal, which was denied by the trial court.

¶ 24 On September 12, 2013, a sentencing hearing was held. A presentencing investigation report (PSI) that was completed prior to the sentencing hearing was admitted into evidence. The report noted that the defendant had no criminal history. The PSI also indicated that the defendant never had any problems related to alcohol and that he drank once or twice a month. The PSI noted that the defendant had been using marijuana three to four times per week since the age of seventeen, and that he normally spent $50 per week on marijuana. The defendant noted that he had smoked marijuana the night before the offense and had consumed one shot of tequila.

¶ 25 During the sentencing hearing, the defense presented mitigating evidence through the testimony of multiple witnesses: Winston Malcolm, Stephanie Malcolm, Fabian Maxey, Jr., Barbara Janusek, Rosemary Rodriguez, Howard Williams, and Scott Johnson.

¶ 26 Following the parties' arguments, the trial court sentenced the defendant to 22 years in prison for first-degree murder and 8 years in prison for robbery, to be served consecutively.[2] The trial court also noted that the defendant will be subjected to three years of mandatory supervised release. The court stated that good people do bad things that still have consequences. The court continued that there was not any remorse when the defendant spoke and that "there must be some deterrence to people who choose violence as some pastime event."

¶ 27 On October 1, 2013, defense counsel filed a motion to reduce sentence, which the court denied. On October 11, 2013, the defense filed a timely notice of appeal.

¶ 28 ANALYSIS

¶ 29 We first note that this court has jurisdiction over this case pursuant to Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Dec. 11, 2014).

¶ 30 We determine the following issues on appeal: (1) whether the trial court erred in convicting the defendant of first-degree murder and robbery based on the theory of accountability; (2) whether the trial court erred in considering evidence of the nontestifying codefendant's statements within the context of the defendant's videotaped interrogation; and (3) whether the trial court properly considered the defendant's background during sentencing.

¶ 31 We first determine whether the trial court erred in convicting the defendant of first-degree murder and robbery based on the theory of accountability.

¶ 32 The Illinois law regarding first-degree murder requires, "[a] person who kills an individual without lawful justification commits first[-]degree murder if, in performing the acts which cause the death: (1) he either intends to kill or do great bodily harm to that

---

[2]Court transcript mentions that the first-degree murder charges were merged but it does not say which ones were merged and which one remained.

individual or another, or knows that such acts will cause death to that individual or another; or (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1 (West 2012). The Illinois statute which describes robbery states that a person commits robbery when he "knowingly takes property *** from the person or presence of another by the use of force or by threatening the imminent use of force." 720 ILCS 5/18-1(a) (West 2012). The trial court convicted the defendant of first-degree murder and robbery under the theory of accountability.

¶ 33    Under Illinois law which outlines accountability, "[a] person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself, or that of another and he is legally accountable for such conduct as provided in Section 5-2 [of the Illinois Criminal Code of 2012], or both." 720 ILCS 5/5-1 (West 2012). The Illinois statute on accountability states that a defendant is legally accountable for the actions of another when:

> "[E]ither before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.
>
> When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." 720 ILCS 5/5-2(c) (West 2012).

In the case at hand, the defendant challenges whether the facts of the case meet all elements of the crime to convict the defendant of first-degree murder and robbery beyond a reasonable doubt based on the theory of accountability.

¶ 34    The defendant argues that this court should review this issue *de novo* because this issue questions whether the trial court's application of the law was accurately applied, although the facts of the case are not at issue. *People v. Chirchirillo*, 393 Ill. App. 3d 916, 921 (2009). The defendant also argues that because there is a video recording of the crime and video recording of the police interrogation available that this court should review this issue *de novo. People v. Flores*, 2014 IL App (1st) 121786, ¶ 35. The State responds that the proper standard of review is whether after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Fernandez*, 2014 IL 115527, ¶ 13. We find the State to be correct regarding the standard of review. The scope of the defendant's right to appeal does not mean an unlimited review or a *de novo* trial in the reviewing court. *People v. Harrawood*, 66 Ill. App. 3d 163 (1978). The appellate court can review a case *de novo* only if the issue being questioned is a question of law. *People v. Chirchirillo*, 393 Ill. App. 3d 916, 921 (2009). However, a reviewing court "will not substitute [its] judgment for that of the trier of fact." *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Even with the videotape of the crime and the defendant's videotaped interrogation, the trial court saw firsthand the testimony and is in a more superior position than the reviewing court regarding the testimony and credibility of witnesses.

¶ 35    As to the first element of accountability, the defendant argues that he did not intend to kill or rob the victim in any way as he was only recording what Jones did. The defendant argues that he did not know with certainty that Jones was going to hit or rob the victim prior to the incident actually happening. The defendant further argues that Jones announced that he was going to hit the victim and then did so. The defendant argues that the incident should be considered a spontaneous event because the defendant did not know, before that announcement, what Jones was going to do. The defense also argues that the defendant had no prior knowledge of the robbery before it happened.

¶ 36    The State responds that intent may be inferred not only through acts but through circumstances and surroundings as well. See *People v. Perez*, 189 Ill. 2d 254, 266 (2000). The State argues that the defendant agreed to record the incident on Jones' cellular telephone and then completed that task. Based on this action by the defendant, the State argues, he showed both his intent and the common design to commit the crimes. The State continues that it was not a spontaneous event because Jones announced what he was planning to do and the defendant continued to follow Jones and record the incident.

¶ 37    The defense references *Dennis* in which our supreme court found the defendant to not be liable under the accountability theory because the defendant had no knowledge of the principal's intent to commit armed robbery when he drove away from the scene of the crime. *People v. Dennis*, 181 Ill. 2d 87, 105-06 (1998). However, *Dennis* is inapposite to the case at hand because the defendant knew that Jones was going to hit the victim. The defendant knew this because Jones and Ayala announced that was what they were going to do prior to doing it and the defendant still took the cellular telephone and stayed with Jones and Ayala while recording the incident. This is not a spontaneous event. The defendant had every opportunity to leave or not take the cellular telephone, but he chose to do neither. In fact, the evidence suggests that the defendant voluntarily took the cellular telephone from Ayala to record the incident since Ayala suggested that he would be busy hitting the victim "next." As for the robbery, when Jones walked up to the victim he asked him for the contents of his pockets. Shortly after hitting the victim and running a short distance away, Jones came back and took the victim's wallet. It can be inferred that the defendant knew that Jones wanted to rob the victim when Jones asked the victim for the contents of his pockets. The defendant had the choice and the ability to leave the scene but did not. Rather, the defendant stayed and videotaped the attack and watched as Jones and Ayala took the victim's wallet after knocking the victim to the ground. Therefore, we find that the defendant had a shared intent to hit and rob the victim consistent with the theory of accountability.

¶ 38    As to the second element of accountability, the defendant argues that he was not part of the common plan to kill or rob the victim. The defendant again argues that Jones announcing that he was going to hit the victim 30 seconds before he did was not enough advance notice to be considered a plan to commit first-degree murder or robbery and that rather this was a spontaneous event. The defendant argues, in relation to the robbery charge, that he did not return with Jones to where the victim lay on the ground when Jones went back to take the victim's wallet. Therefore, he argues that he could not have been a party to the plan to rob the victim.

¶ 39    The State argues that Jones announcing that he was going to "knock out" the victim is evidence of a criminal design. The State argues that the defendant did not have to verbally agree to the plan to be convicted under the theory of accountability. See *Perez*, 189 Ill. 2d at

267. The State further argues that it does not matter how long before the incident the plan was developed because once a plan was formulated the defendant went along with it and therefore shared the intent of Jones. The State also argues that the defendant's agreeing to record the punching of the victim, also makes him guilty of robbery which occurred after the victim was punched.

¶ 40 The defense references *Fernandez* in which our supreme court found that under the theory of common design, the defendant was accountable for " 'any criminal act done in furtherance of the planned and intended act.' " (Emphasis omitted.) *People v. Fernandez*, 2014 IL 115527, ¶ 16 (quoting *People v. Kessler*, 57 Ill. 2d 493, 497 (1974)). However, the *Fernandez* case works directly against the defendant's theory in this case. In *Fernandez*, the defendant entered into a plan with his companion, who he did not know was armed, to commit burglary. *Id.* ¶ 17. While the companion was committing the burglary he was interrupted unexpectedly and shot the person who interrupted him. *Id.* The shooting was not planned with the defendant prior to the burglary but the court found that the defendant was still responsible because the shooting was done in furtherance of the burglary. *Id.* In the case at hand, Jones announced he was going to hit the victim before actually doing so. Rather than immediately leaving the scene, the defendant went along with the plan and voluntarily recorded the event with Jones' cellular telephone. Jones also asked the victim for the contents of his pockets and later, after the victim had been attacked and was lying on the ground, Jones took the victim's wallet. The defendant made no attempt to leave the scene during the entire episode. Based on the finding in *Fernandez*, the defendant is responsible for the robbery under a theory of accountability, because it was done during the intended criminal act. The defendant also argues that the recording of the incident proved that there was no common plan. The recording shows that the video function on the cellular telephone was turned on, Jones then announced that he was going to hit the victim, handed the phone to Ayala, who then also announced that he wanted to hit the guy next, and then the defendant took the phone. However, the defendant said "just give it to me" which suggests that he voluntarily took the phone, thereby agreeing to record Jones and Ayala hitting the victim. Based on the facts of this case, we believe not only was there a shared intent but that intent also flowed into a common criminal design or plan to both hit and rob the victim.

¶ 41 As to the third element of accountability, the defendant argues that he did not aid Jones in committing first-degree murder or robbery. The defendant argues that he did not take part in or agree to the crimes. The defendant argues he was only present during the punching of the victim and he was not near the victim when Jones robbed him. The defendant argues that the recording of the incident did nothing to aid or abet the conduct that is an element of first-degree murder or robbery. The defendant states that there is no way to know why Jones wanted a recording of the event and because of this, there is no way to interpret the recording as aiding and abetting Jones in the commission of first-degree murder and robbery. The defendant argues that he stood at the entrance of the alley when Jones went back to the victim and took his wallet. The defendant argues that he did not help or intend to help in the robbery of the victim and was not part of a plan to do so.

¶ 42 The State argues that the defendant aided in committing both first-degree murder and robbery because the defendant agreed to record the punching of the victim. The State further argues that by agreeing to record the incident, the defendant was aiding in the criminal act. The State argues that even if the defendant only intended to aid in one criminal act, he is

guilty of all other criminal acts which flowed from or were committed during the completion of the one planned criminal act, specifically the punching of the victim.

¶ 43    It is clear that the defendant had plenty of time to say "no" and remove himself from the scene. Rather, he agreed to take Jones' cellular telephone and record the attack. The defendant asked for the cellular telephone while being aware that Jones intended to record whatever he was going to do to the victim. Based on Jones turning on the video function of his cellular telephone, handing the cellular telephone to his companion and then announcing that he was going to "knock this mother fucker out," it is pretty clear that he wanted the event to be recorded. The defendant, by accepting the cellular telephone, accepted participation in Jones' plan, and in helping Jones complete his desired goal of recording himself attacking the victim. The eventual posting of the video on Facebook further supported Jones' goal. It is also clear that the defendant was doing more than watching the incident. The defendant was recording the incident on Jones' cellular telephone. While the defendant himself did not do the act of attacking the victim, he was clearly part of the plan to do so and actively took part in this plan by recording the incident. Therefore, we believe that the trial court properly found that the evidence supported the finding that the defendant aided, abetted, and agreed to being involved in the crimes.

¶ 44    In *Taylor*, our supreme court set forth several factors to be considered when looking to convict a defendant under the theory of accountability: if the defendant was present; if the defendant maintained a close affiliation with the group after the overt act; if the defendant attaches himself to a group bent on illegal acts; if the defendant failed to report the crime; and if the defendant fled the scene of the crime. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). We find that *Taylor* is instructive in analyzing a conviction based on the theory of accountability. Overt participation by the defendant in the criminal act is not necessary for a finding of accountability. *People v. Ruiz*, 94 Ill. 2d 245, 254 (1982); *Taylor*, 164 Ill. 2d at 140-41; *People v. Flynn*, 2012 IL App (1st) 103687, ¶ 23.

¶ 45    In this case, the defendant argues that his mere presence at the scene of the crime is not enough to make him accountable for the acts of Jones and that Jones did not need the defendant at the scene to complete the crimes. The State responds that the defendant was more than merely present at the scene of the crime because he was recording the incident with Jones' cellular telephone and the crime may not have happened without the defendant recording the act.

¶ 46    We find that based on the factors in *Taylor*, the defendant's presence at the scene of the crime is just one factor to be considered when determining if the defendant can be convicted under the accountability theory. *Taylor*, 164 Ill. 2d at 141. Therefore, the trial court properly considered the defendant's presence when coming to the conclusion that the defendant is accountable for the first-degree murder and robbery of the victim.

¶ 47    Second, the defendant argues that he did not have a close affiliation with Jones and did not continue to be around him after he reached Ayala's house on the day of the incident. The defendant also argues that there was no evidence presented that he had any contact with Jones before the day of the incident and no evidence of any contact with Jones after the day of the incident. The State responds that the defendant stayed with Jones and Ayala after the crime occurred at least to the extent that he knew where the wallet was discarded after the robbery. This means that he kept a close affiliation with Jones and Ayala immediately after the incident. The State argues that it does not matter if the defendant was friends with Jones

- 10 -

prior to the events in question but that he was with him during the incident and stayed with him afterwards was enough to create a close affiliation with Jones. The State argues that based on the facts of the case, the defendant was friends with Ayala and was heading to his house the morning of the incident and therefore clearly had a close affiliation with Ayala.

¶ 48    We find that the defendant stayed in the presence of both Jones and Ayala after the punching of the victim and the robbery of the victim. According to the defendant's videotaped interrogation, he saw Jones discard the victim's wallet sometime after the robbery. According to Shaeffer's testimony, she found the victim's wallet in the alley of the 6200 block of North Campbell, which was a different location than where the attack and robbery occurred. This is enough to conclude that the defendant stayed with Jones and Ayala after the attack and, therefore, satisfies the close affiliation factor. Thus, the trial court properly considered the defendant's close affiliation with Jones and Ayala in determining he was accountable for first-degree murder and robbery of the victim.

¶ 49    Third, the defendant argues that there was no evidence presented that the defendant attached himself to Jones knowing that Jones intended to commit illegal acts. The defendant argues that he learned of Jones' intent only seconds before Jones hit the victim and that the State provided an unreasonable interpretation of the facts which was inconsistent with meeting its burden of proof. The defendant argues that *Parker* should be used as a comparison to the case at hand. The defendant argues that in the *Parker* case, the court found that the defendant did not do anything in furtherance of the crime as he stood and watched the lengthy attack on the victim. *People v. Parker*, 311 Ill. App. 3d 80, 87 (1999). The defendant argues that the only thing in common between Jones and himself is that they shared a route walking to their respective destinations on the date of the incident. Finally, the defendant argues that he never voluntarily attached himself to a group bent on criminal activities and instead found himself in the presence of Jones, who acted spontaneously in the commission of criminal acts.

¶ 50    The State responds that past criminal behavior of the people the defendant was with and their prior criminal records are a factor to be considered under the theory of accountability. The State argues that the defendant knew of his companions' reputations and that the defendant still was a friend of Ayala and stayed in the presence of Jones on the date of the incident. The State argues that Jones announcing that he wanted to "knock the mother fucker out" is enough to show that the defendant knew that illegal criminal activity was going to take place and therefore it showed the defendant knew that the group was intending to commit illegal acts.

¶ 51    We agree that it is important to consider the defendant's knowledge of his companions at the time of the incident. The defendant was a friend of Ayala's as evidenced by the fact that he was on his way to Ayala's house when the attack on the victim occurred. There was also evidence within the videotaped interrogation that the defendant knew that Jones had recently got out of juvenile detention. There is no doubt that the defendant knew the reputations of his companions. Even if the defendant did not know Jones and Ayala very well, when Jones announced that he was going to "knock out" a person whom he did not know, the defendant must have known that illegal acts that could cause great bodily harm were going to take place. This court agrees that where one attaches himself to a group bent on illegal and dangerous acts, he becomes accountable for these acts. *Flynn*, 2012 IL App (1st) 103687,

¶ 23. Therefore, the trial court properly considered this factor in convicting the defendant of first-degree murder and robbery based on the theory of accountability.

¶ 52    Finally, the State argues that the trial court correctly considered the unrebutted fact that the defendant did not call the police and instead fled the scene of the crime. This court finds that the trial court properly considered this factor in convicting the defendant of first-degree murder and robbery.

¶ 53    This is a case of first impression, which involves the recording of a crime and the accountability of the person doing the recording. After reviewing all the facts of the case at hand, the applicable Illinois statutes and supporting case law, this court affirms the trial court's decision to convict the defendant of first-degree murder and robbery based on the theory of accountability and we hold that a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.

¶ 54    Next, we determine whether the trial court erred in considering evidence of the nontestifying codefendant's statements within the context of defendant's videotaped interrogation.

¶ 55    The sixth amendment to the United States Constitution states that the accused has a right to, "be confronted with the witnesses against him." U.S. Const., amend. VI. The Illinois Constitution echoes this same right. Ill. Const. 1870, art. I (amended 1964), § 8. The defendant claims that this right was violated.

¶ 56    The defendant argues that the trial court violated his sixth amendment right to confrontation by considering nontestifying codefendant Jones' statement as substantive evidence and using this evidence as a basis for the guilty finding against the defendant. The defendant claims that the trial court improperly considered the line of questioning within the videotaped interrogation regarding whether codefendant, Jones, was playing a game. The defendant posits that this issue should be subject to *de novo* review by this court because it is a question of law. The defendant specifically argues that the only reason the detective knew about the existence of a game was because of codefendant, Jones, discussing that information within his own police interrogation. The defendant argues that defense counsel objected to the admission of this line of questioning into evidence and the court in overruling the objection, opined that the court was versed in the rules of evidence and the permissible use of the evidence in question. The defense points to the following statements within the court's ruling in arguing that the court improperly considered whether Jones was playing a game when he attacked the victim:

> "THE COURT: It is a sad travesty that Mr. Delfino Mora died because of actions of people who apparently think that what they were doing was a game. Well, it wasn't a game for Mr. Mora or his family.
>
> * * *
>
> THE COURT: It's a sad game, and I don't even know that you can call it a game, that young men would think this is a way of entertainment.
>
> * * *
>
> THE COURT: And I've also considered that there must be some deterrence to people who choose violence as some pastime event."

The defendant argues that the purpose of admission of the evidence is irrelevant. Specifically, the defendant argues that by considering the questions about the game the court

is violating the right of the accused to confront the witnesses against him and if there is a reasonable possibility that the evidence obtained through codefendant Jones might have contributed to the conviction, this constitutes a sixth amendment violation. The defendant argues that this was not harmless error because the court's consideration of Jones' statement shows that it contributed to the defendant's conviction. The defendant points out that he never admitted that he was playing a game and it is clear within his videotaped interrogation that he thought the incident was just a random occasion and did not believe he was playing a game.

¶ 57    The State responds that Detective Morales' questioning of the defendant in the videotaped interrogation provided inconsistent responses from the defendant in relation to a possible game. The defendant first says it was a random occasion and then says that it was probable that Jones and Ayala were playing a game. The State argues that when defense counsel objected to the admission of any evidence related to the statements by Jones, the State responded that the State was not seeking to admit any such statements as substantive evidence and the court clearly responded that it knew the difference between evidence that is hearsay and evidence that is used to give reference to the answers which the defendant gave during questioning. The State argues that the statements made regarding the game did not directly implicate the defendant. Further, any references made by the trial court are reasonable inferences based on the evidence. The State finally argues that even if this court does conclude an error occurred, it is harmless error because the defendant cannot establish that he was prejudiced by it.

¶ 58    Although the defendant claims that this issue relates to an alleged violation of the confrontation clause and that we should review this issue under a *de novo* standard, we find that, in actuality, this issue pertains to the admissibility of evidence by the court, which we review under an abuse of discretion standard. "Admissibility of evidence is within the sound discretion of the trial court, and its ruling will not be reversed unless there has been an abuse of that discretion." *People v. Trice*, 217 Ill. App. 3d 967, 977 (1991). A trial judge is presumed to know the law and only consider evidence that is both admissible and competent. *People v. Williams*, 246 Ill. App. 3d 1025, 1033 (1993). Nothing in the record before us suggests or shows that the trial court considered inadmissible evidence. During the testimony in question, the State responded to the objection of defense counsel by arguing that the evidence was not being offered for the truth of the matter asserted and was not used as substantive evidence. The court responded that it knew the rules of evidence regarding admissibility, and it would only consider admissible evidence in its ruling. However, even if the evidence highlighted by the defendant was improperly admitted, we find that it was a harmless error. "When a trial error affects a Federal constitutional right, it is reversible error unless it is harmless beyond a reasonable doubt." *People v. Moore*, 229 Ill. App. 3d 66, 77 (1992). To determine whether the error was harmless, this court must look at, "[i]f the evidence of the defendant's guilt is uncontroverted and/or so overwhelming that the constitutional violation resulting from its admission at trial did not have an effect on the verdict, then the error is harmless beyond a reasonable doubt." *Id.*; *People v. Dixon*, 169 Ill. App. 3d 959, 978 (1988). In the case at hand, all elements of the crimes are met regardless of the mention of whether codefendant Jones was playing a game. Therefore, we affirm the decision of the trial court in finding the defendant guilty of first-degree murder and robbery based on a theory of accountability.

¶ 59    The defendant's final issue is whether the trial court properly considered the defendant's background in imposing his sentences.

¶ 60    Both parties agree that the standard of review for sentencing is an abuse of discretion. The trial court has great discretion to assign an appropriate sentence within the statutory limits and is entitled to great deference because the trial court has observed the defendant and the proceedings and has had a better opportunity than the reviewing court to consider all of the factors. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). "[O]ur decisions have firmly established that the imposition of a sentence is a matter of judicial discretion and that, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review." *People v. Perruquet*, 68 Ill. 2d 149, 153 (1977).

¶ 61    The Illinois Constitution states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Specifically, the Illinois Supreme Court Rules state that, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

¶ 62    The Illinois sentencing statute for first-degree murder states that a person shall be imprisoned for not less than 20 years and not more than 60 years. 730 ILCS 5/5-4.5-20 (West 2012). The Illinois statute for a Class 1 felony states that a person shall be imprisoned for not less than 4 years and not more than 15 years. 730 ILCS 5/5-4.5-30 (West 2012).

¶ 63    Based on the Illinois statutes for first-degree murder and robbery, the defendant was properly sentenced within the statutory range, to 22 years for first-degree murder and 8 years for robbery. 730 ILCS 5/5-4.5-20, 5-4.5-30 (West 2012). The defendant argues that based on his mitigation evidence that he should have received the statutory minimums. However, the trial court is allowed broad discretion to assign a sentence within the statutory limits. *Fern*, 189 Ill. 2d at 53.

¶ 64    The defendant argues that the trial court did not properly take into account the defendant's lack of a criminal record and his minimal involvement in the crimes. The defendant argues because of these factors, the minimal sentences should have been applied. The defendant argues that the court must consider not only the circumstances of the case but also the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age and that the court should consider rehabilitation as an objective of the sentence. *People v. Clark*, 374 Ill. App. 3d 50, 68-69 (2007). The defendant argues that the court abused its discretion by imposing a sentence of 22 years for first-degree murder and 8 years for robbery, to be served consecutively, and that he should have received the minimum sentence allowable because of his lack of criminal history, his involvement in the crimes was minimal, and the potential for rehabilitation is great. The defendant argues that the mitigating testimony from family, friends, and his JROTC instructor, his desire to go into the military and be a police officer or FBI agent, and the evidence that he has continued to work towards his high school diploma while in custody shows the strong possibility of rehabilitation.

¶ 65    The State responds that the trial court properly considered all relevant factors in sentencing the defendant within the appropriate statutory range. The State argues that the defendant was found guilty of first-degree murder, which has a sentencing range of 20 to 60 years and the defendant was sentenced to 22 years. The State argues that the defendant was also found guilty of robbery, which has a sentencing range of 4 to 15 years and the defendant

was sentenced to 8 years. The State argues that the defendant cannot show that the trial court abused its discretion in assigning the sentence or improperly considered the aggravating and mitigating evidence presented. The State argues specifically that the trial court has broad discretion in imposing a sentence as it has seen all the evidence and testimony first hand and heard the defendant during the sentencing hearing. *People v. Jones*, 168 Ill. 2d 367, 373 (1995); *Fern*, 189 Ill. 2d at 53; *People v. La Pointe*, 88 Ill. 2d 482, 492-93 (1981). The State argues that the reviewing court cannot substitute its judgment for that of the trial court just because they would weigh the factors differently. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). In this case, the trial court specifically noted during sentencing that there appears to be two different sides to the defendant based on the testimony and that the court cannot completely separate the two for the purposes of sentencing. The trial court noted that there has to be consequences for the defendant's actions and that it has considered all of the aggravating and mitigating factors, but there must be deterrence to people in the future not to do what the defendant did. The State argues that the trial court noted the lack of remorse of the defendant during his conversations with the police. The State argues that the defendant participated in a cruel, senseless crime on a randomly selected victim over the age of 60 and that the sentence that the court imposed is appropriate for the crime and within the statutory range.

¶ 66    We agree with the State. The trial court sentenced the defendant to 22 years for first-degree murder, which is at the low end of the statutory range, and we do not find that it was an abuse of discretion by the trial court. The trial court sentenced the defendant to eight years for robbery, which is within the statutory range and we do not find that it was an abuse of discretion by the trial court. The trial court specifically mentioned that it considered all the aggravation and mitigation evidence. Based on the totality of the factors and circumstances, considered by the trial court, we hold that the court did not abuse its discretion in sentencing the defendant within the statutory ranges and we therefore affirm the defendant's sentences.

¶ 67    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 68    Affirmed.