2023 IL App (2d) 220385-U
No. 2-22-0385
Order filed August 30, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-CF-2168 |
| | ) | |
| CHUCKIE E. CHATMAN, | ) | Honorable |
| | ) | Alice C. Tracy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant was proved guilty, based on accountability, of knowing murder and aggravated discharge of a firearm where (1) defendant's passenger fired at a vehicle occupied by the two victims and (2) the jury could reasonably infer that defendant enlisted the passenger to fire at the victims, given defendant's angry and menacing behavior in the days before, and on the night of the shooting.

¶ 2   Following a jury trial in the circuit court of Kane County, defendant, Chuckie E. Chatman, was convicted of two counts of first degree murder (720 ILCS 5/9-1(a)(2), (a)(3) (West 2020)) and three counts of aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)) in connection with a shooting that resulted in the death of Ernest Hardy.  Hardy died of injuries sustained in a motor vehicle

accident after gunshots were fired at his vehicle, causing him to lose control of the vehicle. Defendant argues on appeal that we must reverse his convictions because he did not fire the shots, and the State failed to prove beyond a reasonable doubt that he was legally accountable for the conduct of whoever did. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was charged in a six-count indictment. Counts I and II charged first degree murder. The counts' common allegation was that defendant fired bullets from a handgun into a motor vehicle operated by Hardy, causing an accident that led to Hardy's death. Count I further alleged that defendant knew his actions created a strong probability of death or great bodily harm to Hardy (*id.* § 9-1(a)(2)), while count II alleged that defendant committed a forcible felony, *i.e.*, aggravated discharge of a firearm (*id.* § 24-1.2(a)(2)), which caused Hardy's death (*id.* § 9-1(a)(3)). Counts III, IV, and V charged aggravated discharge of a firearm (*id.* § 24-1.2(a)(2))— one count for each shot defendant fired at Hardy's vehicle. Count VI charged reckless homicide (*id.* § 9-3).

¶ 5     The following facts were presented at trial. At about 12:05 a.m. on October 17, 2020, two Aurora police officers were in a parking lot at Jefferson Middle School when they heard five to seven gunshots from the west. While heading toward the sound of the gunshots, they received a report of an accident in the 700 block of Redwood Drive. The officers proceeded to that location, where they found Hardy in the driver's seat of a red Dodge Durango. Hardy was barely breathing. The driver's door was too badly damaged to open. When the officers went to the passenger's side to extricate Harvey, they saw that he had stopped breathing. Bullet holes were found in the Durango's passenger compartment, rear bumper, and taillight. Later, a bullet was found lodged in the rear passenger's side wheel rim. The State presented evidence suggesting that Hardy lost

control of the vehicle, at least partly because the bullet lodged in the wheel rim had also struck the tire, causing it to deflate rapidly. Police found in the Durango an employment identification card belonging to Brandy Mitchell.

¶ 6    Hardy did not survive the injuries he sustained in the crash. The forensic pathologist who conducted the autopsy on Hardy testified that he died from a spinal cord injury that caused him to stop breathing.

¶ 7    Mitchell testified that she and defendant had two children together, who were 5 and 12 years old at the time of trial. Mitchell described her relationship with Hardy as "[f]riends with benefits." Several days before Hardy died, defendant sent Mitchell an angry text message that included a photograph Mitchell had posted on social media. The photograph showed Hardy and his friends at Mitchell's home. In the message, defendant described Hardy and his friends as "GangBangers." Defendant added, "[t]his [is] my last time telling you next time them N*** in yo crib yo ass is mines!" On October 17, 2020, Mitchell and defendant spoke by phone several times during the day and at night before the incident. At about 11 p.m., Mitchell heard a knock on her door. When Mitchell opened the door, she saw defendant standing by the bushes at the side of her home. She then closed the door and called Hardy to ask him to come over. Hardy drove to Mitchell's home and picked her up. She and Hardy then drove around. She did not recall where they went. At some point, Hardy began driving fast when a red car was behind them. Mitchell did not recall the type of car. She did recall that defendant drove a red car at the time. Mitchell did not remember telling detectives that the car behind them was defendant's.

¶ 8    Mitchell testified that someone in the red car started shooting. She did not hear gunshots, but she smelled smoke in the car. She admitted that she told detectives that she heard two gunshots.

After the shots were fired, Hardy lost control of the vehicle and struck a tree. Mitchell got out of the vehicle and walked home.

¶ 9 An audio recording of Mitchell's interview with two detectives was admitted into evidence and played for the jury. During the interview, Mitchell indicated that, after Hardy picked her up, they went to a parking lot, where Hardy saw defendant's car. Hardy started driving fast. Mitchell smelled "one [gunshot] and heard two [gunshots]." She looked back and saw defendant's car.

¶ 10 A detective obtained video taken shortly after 12 a.m. by a surveillance camera located on Redwood Drive. Screenshots from the video were admitted into evidence. The screenshots are rather ill-defined; the detective interpreted them based on his experience. According to the detective, the screenshots depicted a Chrysler traveling north on Redwood, and some showed what appeared to be muzzle flashes from a firearm being fired from the passenger's side of the Chrysler.

¶ 11 When interviewed by police, defendant claimed that Mitchell was lying and knew nothing about the crash that killed Hardy. He stated that he was at home at the time of the crash and that he had not spoken to Mitchell in two months. He denied making phone calls to her on the night of the crash.

¶ 12 During closing argument, the prosecutor contended that defendant was driving the Chrysler and that a passenger fired the shots that struck Hardy's vehicle. The prosecutor argued that defendant was guilty of first degree murder based on principles of accountability (see *id.* § 5-2(c)). The jury was instructed on accountability.

¶ 13 The jury returned a general verdict of guilty on the first degree murder counts and found defendant guilty on all three counts of aggravated discharge of a firearm. The jury found defendant not guilty of reckless homicide. The jury also made a special finding that defendant was armed with a firearm.

¶ 14    At sentencing, the trial court found that the conviction on count II (felony murder) merged into the conviction on count I (knowing murder).  On count I, the court sentenced defendant to 28 years' imprisonment, along with a 15-year enhancement based on the finding that defendant was armed with a firearm (see 730 ILCS 5/5-8-1(a)(1), (d)(i) (West 2020)).  The court imposed three 10-year prison terms for aggravated discharge of a firearm, to be served concurrently with each other and with the prison term for first degree murder.

¶ 15    Defendant filed this timely appeal.

¶ 16                                II. ANALYSIS

¶ 17    Defendant does not dispute that he was driving his vehicle when a passenger fired the shots that caused Hardy to lose control of his vehicle and crash it into a tree, resulting in Hardy's death. Defendant argues, however, that the State failed to prove beyond a reasonable doubt that he was legally accountable for the passenger's conduct.  He asks us, therefore, to reverse his convictions of first degree murder and aggravated discharge of a firearm.

¶ 18    A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt.  *People v. Collins*, 106 Ill. 2d 237, 261 (1985).  When the sufficiency of the evidence is challenged, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.)  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In reviewing the sufficiency of the evidence, "there is no legal distinction between direct and circumstantial evidence as to the weight and effect thereof."  *People v. Case*, 246 Ill. App. 3d 566, 576 (1993).  It is well established that "[c]ircumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt of the

elements of the crime charged." *People v. Hall*, 194 Ill. 2d 305, 330 (2000). The reasonable doubt standard does not require the trier of fact to disregard inferences that flow normally from the evidence. *People v. Saxon*, 374 Ill. App. 3d 409, 417 (2007). Nor is the trier of fact "obligated to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." (Internal quotation marks omitted.) *People v. Sutherland*, 223 Ill. 2d 187, 272 (2006).

¶ 19    Defendant was charged with two counts of first degree murder. Count I charged knowing murder, and count II charged felony murder. Section 9-1(a)(2) and (a)(3) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/9-1(a)(2), (a)(3) (West 2020)) provides in pertinent part:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

\*\*\*

(2) he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he or she, acting alone or with one or more participants, commits or attempts to commit a forcible felony other than second degree murder, and in the course of or in furtherance of such crime \*\*\* he or she or another participant causes the death of a person."

¶ 20    The jury returned a general verdict finding defendant guilty of first degree murder. "Under Illinois law, where an indictment contains several counts arising out of the same transaction and a general verdict of guilty is returned, the effect is that the defendant is guilty as charged as to each count to which the proof is applicable." *People v. Davidson*, 2023 IL App (2d) 220140, ¶ 66. The trial court merged the conviction on count II (felony murder) into the conviction on count I

(knowing murder) and imposed sentence on count I. We have no jurisdiction over the unsentenced conviction on count II because it is a nonfinal judgment. See *People v. Caballero*, 102 Ill. 2d 23, 51 (1984) (no jurisdiction to review armed violence convictions on which sentence was not imposed); *People v. Olaska*, 2017 IL App (2d) 150567, ¶¶ 112-13 (no jurisdiction over unsentenced felony murder convictions merged into knowing murder conviction).

¶ 21 Defendant was also convicted of multiple counts of aggravated discharge of a firearm. A defendant commits this offense when he knowingly or intentionally "[d]ischarges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person[.]" 720 ILCS 5/24-1.2(a)(2) (West 2020).

¶ 22 In determining whether the evidence supports the knowing murder and aggravated discharge convictions, we apply accountability principles, on which the jury was instructed. Section 5-1 of the Criminal Code (*id.* § 5-1) provides that "[a] person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself, or that of another and he is legally accountable for such conduct as provided in Section 5-2 [of the Criminal Code (*id.* § 5-2)], or both." Section 5-2(c) of the Criminal Code (*id.* § 5-2(c)) provides, in pertinent part:

"A person is legally accountable for the conduct of another when:

* * *

(c) either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.

When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are

considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability."

¶ 23    As noted, defendant does not deny that he was driving his vehicle when his passenger fired the shots that struck Hardy's vehicle. Clearly, defendant's driving enabled the passenger to be in position to fire those shots. Defendant argues, however, that the State failed to prove that he acted with the requisite mental state to sustain a conviction based on principles of accountability. Specifically, defendant argues that the State presented no evidence that he knew his passenger had a gun or that the passenger intended to use it.

¶ 24    Contrary to defendant's argument, the State presented ample circumstantial evidence that defendant knew his passenger was armed and intended to fire at Hardy's vehicle. The evidence shows that defendant was angry after seeing a picture showing Hardy at Mitchell's home. That night, defendant knocked on the door to Mitchell's home, but then retreated to the bushes. After Mitchell shut the door on defendant, he remained near Mitchell's home. They spoke by phone, as they had earlier that day. After Hardy picked Mitchell up in his Durango, they encountered defendant's Chrysler, and defendant followed them. While the vehicles were on Redwood Drive, a passenger in defendant's vehicle fired several shots at the Durango. The most natural inference arising from these facts is that defendant enlisted the passenger to fire at the Durango to exact revenge against Mitchell, Hardy, or both.

¶ 25    Defendant would have us believe that he did not know that his passenger was armed and that, for some unknown reason, his passenger acted on his or her own initiative in opening fire on

the Durango. Although there is a remote possibility that that is what occurred, that possibility does not give rise to a reasonable doubt of defendant's guilt. See *Sutherland*, 223 Ill. 2d at 272.

¶ 26 We note that, "[i]n determining a defendant's legal accountability, the trier of fact may consider the defendant's presence during its commission, the defendant's continued close association with other offenders after its commission, the defendant's failure to report the crime, and the defendant's flight from the scene." *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 53. Although there is no evidence indicating whether defendant maintained a close association with the passenger after the incident, defendant was present during the commission of the offense, failed to report it, and fled the scene. Moreover, when interviewed by police, defendant falsely claimed that he had not spoken with Mitchell for two months and that he was home at the time of the incident. "A false exculpatory statement is probative of a defendant's consciousness of guilt." (Internal quotation marks omitted.) *People v. Milka*, 211 Ill. 2d 150, 181 (2004).

¶ 27 The jury could reasonably infer that defendant knew that his passenger was armed and would fire at Hardy's vehicle. Thus, the evidence was sufficient to sustain defendant's convictions of aggravated discharge of a firearm. Furthermore, the jury could reasonably infer that both defendant and his passenger knew that firing at Hardy's vehicle created a strong probability of death or great bodily harm to Hardy. Thus, the evidence was also sufficient to sustain defendant's conviction of first degree murder.

¶ 28 In support of his argument that the evidence was insufficient, defendant cites *People v. Johnson*, 2014 IL App. (1st) 122459-B, and *People v. Estrada*, 243 Ill. App. 3d 177 (1993). In *Johnson*, the defendant was driving with Clayton Sims. *Johnson*, 2014 IL App. (1st) 122459-B, ¶ 7. Sims indicated that he wanted to buy marijuana from Brian Baity. *Id.* When the defendant and Sims stopped near Baity's vehicle, Sims stepped out and shot Baity. *Id.* There was conflicting

evidence as to whether the defendant then drove away with Sims. *Id.* The *Johnson* court found that the evidence was insufficient to establish that the defendant was responsible for Sims's conduct. *Id.* ¶ 158. Unlike in this case, however, in *Johnson* there was no evidence that the defendant had a reason to harm the victim. See *id.* ¶ 161. Thus, *Johnson* is readily distinguishable from this case.

¶ 29 In *Estrada*, the defendant and several other individuals were riding in a vehicle driven by Juan Portillo. *Estrada*, 243 Ill. App. 3d at 178. At some point, Portillo pulled the vehicle in front of a building where Jesus Sanchez stood. *Id.* at 178-79. The defendant exited the vehicle brandishing a tire iron, and then Portillo shot Sanchez. *Id.* at 179, 185. Sanchez died from his injuries. *Id.* at 181. The trial court found the defendant guilty of first degree murder on a theory of accountability. *Id.* at 177. In reversing the conviction, the *Estrada* court reasoned:

> "In the present case there is no direct evidence tying [the defendant] to a common plan or design to shoot Sanchez. The evidence shows that [the defendant], who left the car brandishing a tire iron, had already exited the car when Portillo fired a gun at Sanchez. Although [the defendant's] acts indicate that he intended to intimidate Sanchez, there is no evidence that he was aware that Portillo intended to shoot at Sanchez. In fact, it is less likely that [the defendant] would leave the car to pursue Sanchez if he knew that Portillo intended to fire at Sanchez." *Id.* at 185.

No similar circumstances exist in this case.

¶ 30                                      III. CONCLUSION

¶ 31 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 32 Affirmed.